UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WILLIAM B FRANCOM, TINA FRANCOM, JASON HARVEY, ROBERT HOLLAND, SCOTT JOHNSON, DODY JOHNSON, KODY KRINER, DAVID O'QUINN, GARY PARENT, KELLY SANCHEZ, JAMES SEMPTER, ABHINAV TIWARI, KIMYETTA YOUNG, GBUBEMI JOHN, SHARI COLBY, TRAVIS COLBY, RONALD GRAY, JACQUELYN GRAY, KRYSTLE JORDAN, MICHAEL LANDRY, JESSICA MILLIGAN, SHARON MORRISON, ANDREW MOST, DAVID SINCLAIR, DEE SINCLAIR, JAMES TIRONE, MICHELLE TULLY, OAKASHA KHAN, FRANK SICARA, AIMEE SHERMAN, BRANDI PHILLIPS, JERRY PHILLIPS, EDWIN RODRIGUEZ, EDNA RODRIGUEZ, JOSEPH BATTIN, GLEN BLAUNSTEIN, TERRI BLAUNSTEIN, MICHAEL CHRISTIANO, WILLIAM CLARK, HOWARD KAPLAN, AVI MANDEL, AJL DESIGN AND INSTALLATION, INC, SELVIA MUZHA, RANDY RAETZ, GEOFFREY TERWILLIGER, ATHENA VILLEGAS. PHILLIP MONTE, LOUIS SIMPSON, BENJAMIN COOPER, GEORGIANA COOPER, SCOTT BECKSTRAND, CARRIE BECKSTRAND, MAX COULLIETTE, RANDY CUMMINS, TRAVIS FOSTER, GREG GARRICK, JEFFREY INGLEBY, JERAMY JOHNSON, MITCHELE KRULL, RACHEL KRULL, NICOLE MURRAY, THAROLD NORTHUP, BRENDA NORTHUP, RICHARD POLLOCK, WILLIAM RADER, WILLIAM SORENSEN, ROXANNE WEATHERHEAD, ROBERT ZAUGG, AMANDA PAYNE-ZAUGG, JOHN CARLSON, SARAH ERVIN AND KATRINA BEARS,

Plaintiffs,

vs.

FCA US, LLC,

Defendant

§ § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § §

CASE NO.

**JURY TRIAL DEMANDED**

# PLAINTIFFS' COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs ("Plaintiffs") William Francom, Tina Francom, Jason Harvey, Robert Holland, Scott Johnson, Dody Johnson, Kody Kriner, David O'Quinn, Gary Parent, Kelly Sanchez, James Sempter, Abhinav Tiwari, Kimyetta John, Gbubemi John, Shari Colby, Travis Colby, Ronald Gray, Jacquelyn Gray, Krystle Jordan, Michael Landry, Jessica Milligan, Sharon Morrison, Andrew Most, David Sinclair, Dee Sinclair, James Tirone, Michelle Tully, Oakasha Khan, Frank Sciara, Aimee Sherman, Brandi Phillips, Jerry Phillips, Edwin Rodriguez, Edna Rodriguez, Joseph Battin, Glen Blaunstein, Terri Blaunstein, Michael Christiano, William Clark, Howard Kaplan, Avi Mandel, AJL Design and Installation, Inc, Selvia Muzha, Randy Raetz, Geoffrey Terwilliger, Athena Villegas, Phillip Monte, Louis Simpson, Benjamin Cooper, Georgiana Cooper, Scott Beckstrand, Carrie Beckstrand, Max Coulliette, Randy Cummins, Travis Foster, Greg Garrick, Jeffrey Ingleby, Jeramy Johnson, Mitchele Krull, Rachel Krull, Nicole Murray, Tharold Northup, Brenda Northup, Richard Pollock, William Rader, William Sorensen, Roxanne Weatherhead, Robert Zaugg, Amanda Payne-Zaugg, John Carlson, Sarah Ervin and Katrina Bears ("Plaintiffs") file this Complaint complaining of FCA US, LLC and respectfully shows the Court as follows:

## PARTIES

## IDAHO PLAINTIFFS

**William Francom and Tina Francom**

1. Plaintiffs William Francom and Tina Francom are citizens and residents of the State of Nevada who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR61PW521883 (hereinafter, the "Vehicle") on or about December 11, 2024 from Dennis Dillon Chrysler Dodge

Jeep Ram in Caldwell, Idaho. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

2. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

3. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

4. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

5. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

6. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

7. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

8. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jason Harvey**

9. Plaintiff Jason Harvey is a citizen and resident of the State of Idaho who leased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR63MW674535 (hereinafter, the "Vehicle") on or about July 12, 2021 from Peterson Chrysler Dodge Jeep Ram in Nampa, Idaho. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

10. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

11. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

12. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

13. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

14. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

15. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

16. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Robert Holland**

17. Plaintiff Robert Holland is a citizen and resident of the State of California who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR68MW812070 (hereinafter, the "Vehicle") on or about November 12, 2021 from Dennis Dillon Chrysler Dodge Jeep Ram in Caldwell, Idaho. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

18. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

19. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

20. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

21. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

22. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

23. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

24. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Scott Johnson and Dody Johnson**

25. Plaintiffs Scott Johnson and Dody Johnson are citizens and residents of the State of Idaho who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP67NW116370 (hereinafter, the "Vehicle") on or about March 28, 2024 from Dave Smith Motors in Kellogg, Idaho. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

26. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

27. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or

exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

28. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

29. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

30. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away

from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

31. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

32. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated September 14, 2026.

**Kody Kriner**

33. Plaintiff Kody Kriner is a citizen and resident of the State of Arizona who leased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP67MW675531 (hereinafter, the "Vehicle") on or about May 22, 2021 from Larry H. Miller Chrysler Jeep Dodge Ram in Boise, Idaho. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

34. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

35. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

36. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

37. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

38. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

39. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

40. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**David O'Quinn**

41. Plaintiff David O'Quinn is a citizen and resident of the State of Idaho who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR6XMW677870 (hereinafter, the “Vehicle”) on or about May 6, 2021 from Findlay Chrysler Jeep Dodge Ram in Post Falls, Idaho. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

42. Plaintiff made the decision to purchase the Vehicle after considering FCA’s representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle’s represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle’s alleged utility and FCA’s reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA’s implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

43. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA’s specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

44. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

45. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

46. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

47. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

48. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Gary Parent**

49. Plaintiff Gary Parent is a citizen and resident of the State of Idaho who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP68NW182832 (hereinafter, the "Vehicle") on or about December 26, 2024 from Fairly Reliable Bob's Used Car in Boise, Idaho. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

50. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

51. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

52. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

53. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

54. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

55. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

56. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Kelly Sanchez**

57. Plaintiff Kelly Sanchez is a citizen and resident of the State of Idaho who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR66PW588284 (hereinafter, the "Vehicle") on or about November 7, 2023 from Sayer Nissan in Idaho Falls, Idaho. Plaintiff purchased the

vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

58. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

59. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

60. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

61. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

62. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

63. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

64. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**James Sempter**

65. Plaintiff James Sempter is a citizen and resident of the State of Idaho who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXN69PW591993 (hereinafter, the "Vehicle") on or about July 1, 2024 from Peterson Chrysler Dodge Jeep Ram in Nampa, Idaho. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

66. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

67. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

68. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

69. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

70. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

71. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

72. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Abhinav Tiwari**

73. Plaintiff Abhinav Tiwari is a citizen and resident of the State of California who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR6XMW868818 (hereinafter, the "Vehicle") on or about January 4, 2022 from Peterson Chrysler Dodge Jeep Ram in Nampa, Idaho. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

74. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

75. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

76. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

77. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

78. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

79. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

80. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**NORTH DAKOTA PLAINTIFF**

**Gbubemi John**

81. Plaintiff Gbubemi John is a citizen and resident of the State of North Dakota who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB65N8715689 (hereinafter, the "Vehicle") on or about December 1, 2022 from Corwin Chrysler Jeep Dodge Ram in Fargo, North Dakota. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

82. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

83. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the

Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

84. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

85. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA’s recall instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle’s range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

86. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery

would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

87. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

88. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**NEW HAMPSHIRE PLAINTFFS**

**Shari Colby and Travis Colby**

89. Plaintiffs Shari Colby and Travis Colby are citizens and residents of the State of New Hampshire who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP6XPW580272 (hereinafter, the "Vehicle") on or about March 1, 2023 from Nucar CDJR of Tilton in Tilton, New Hampshire. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

90. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs

chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

91. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

92. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

93. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle

was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

94. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it.

95. At the time of the lease, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

96. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Ronald Gray and Jacquelyn Gray**

97. Plaintiffs Ronald Gray and Jacquelyn Gray are citizens and residents of the State of New Hampshire who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP6XPW606000 (hereinafter, the "Vehicle") on or about March 7, 2023 from Bonneville and Son CDJR in Manchester, New Hampshire. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

98. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

99. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably

expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

100. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

101. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

102. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid

substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

103. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

104. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Krystle Jordan**

105. Plaintiff Krystle Jordan is a citizen and resident of the State of New Hampshire who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP67PW605693 (hereinafter, the "Vehicle") on or about May 16, 2023 from Contemporary Automotive in Milford, New Hampshire. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

106. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

107. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

108. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

109. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

110. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

111. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

112. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Michael Landry**

113. Plaintiff Michael Landry is a citizen and resident of the State of New Hampshire who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXN66PW684633 (hereinafter, the "Vehicle")

on or about May 8, 2023 from Bournival Jeep in Portsmouth, New Hampshire. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

114. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

115. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

116. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

117. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA’s recall instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle’s range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

118. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle’s electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

119. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

120. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jessica Milligan**

121. Plaintiff Jessica Milligan is a citizen and resident of the State of New Hampshire who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXN69PW683699 (hereinafter, the "Vehicle") on or about October 23, 2023 from Foss Motors in Exeter, New Hampshire. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

122. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

123. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

124. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

125. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

126. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

127. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

128. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Sharon Morrison**

129. Plaintiff Sharon Morrison is a citizen and resident of the State of New Hampshire who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR63MW659212 (hereinafter, the "Vehicle") on or about April 21, 2021 from Bournival Jeep in Portsmouth, New Hampshire. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

130. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

131. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

132. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

133. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

134. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

135. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

136. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Andrew Most**

137. Plaintiff Andrew Most is a citizen and resident of the State of New Hampshire who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP67PW686078 (hereinafter, the "Vehicle") on or about August 24, 2024 from Nucar Ford of Lebanon in Lebanon, New Hampshire. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

138. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

139. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the

Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

140. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

141. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

142. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from

other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

143. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

144. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**David Sinclair and Dee Sinclair**

145. Plaintiffs David Sinclair and Dee Sinclair are citizens and residents of the State of New Hampshire who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP6XMW765501 (hereinafter, the "Vehicle") on or about December 23, 2021 from Contemporary Automotive in Milford, New Hampshire. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

146. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

147. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

148. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

149. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

150. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

151. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

152. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**James Tirone**

153. Plaintiff James Tirone is a citizen and resident of the State of Massachusetts who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR66PW629304 (hereinafter, the "Vehicle") on or about August 22, 2025 from Key Acura of Portsmouth in Portsmouth, New Hampshire. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

154. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

155. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

156. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

157. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

158. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

159. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

160. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Michelle Tully**

161. Plaintiff Michelle Tully is a citizen and resident of the State of New Hampshire who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXN6XPW684036 (hereinafter, the "Vehicle") on or about June 25, 2023 from Bob Mariano CDJR in Concord, New Hampshire. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

162. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

163. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

164. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

165. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

166. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

167. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

168. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Oakasha Khan**

169. Plaintiff Oakasha Khan is a citizen and resident of the State of New Jersey who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP69MW716967 (hereinafter, the "Vehicle") on or about June 25, 2023 from a private seller in Nashua, New Hampshire. Plaintiff purchased

the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

170. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

171. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

172. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

173. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

174. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

175. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

176. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated October 19, 2026.

**Frank Sciara**

177. Plaintiff Frank Sciara is a citizen and resident of the State of New York who leased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP63NW256707 (hereinafter, the "Vehicle") on or about July 8, 2022 from Claremont CDJR in Claemont, New Hampshire. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

178. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

179. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

180. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

181. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

182. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

183. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

184. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated October 19, 2026.

**Aimee Sherman**

185. Plaintiff Aimee Sherman is a citizen and resident of the State of New Hampshire who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP60MW701029 (hereinafter, the "Vehicle") in or about August 2024 from McGovern Toyota of Portsmouth in Portsmouth, New Hampshire. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

186. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

187. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

188. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

189. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

190. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

191. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

192. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated October 19, 2026.

**NEW MEXICO PLAINTIFFS**

**Brandi Phillips and Jerry Phillips**

193. Plaintiffs Brandi Phillips and Jerry Phillips are citizens and residents of the State of New Mexico who leased, then purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR67PW516350 (hereinafter, the "Vehicle") on or about December 31, 2022 from Larry H. Miller Casa Chrysler Jeep in Albuquerque, New Mexico. Plaintiffs leased, then purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

194. Plaintiffs made the decision to lease to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing, then purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

195. Prior to Plaintiffs' lease to purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function

normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

196. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased, then purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

197. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

198. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing, then purchasing the Vehicle. Had

Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased, then purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have leased, then purchased the Vehicle or would have paid substantially less for it.

199. At the time of the lease to purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased, then purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

200. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Edwin Rodriguez and Edna Rodriguez**

201. Plaintiffs Edwin Rodriguez and Edna Rodriguez are citizens and residents of the State of New Mexico who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR63PW518483 (hereinafter, the "Vehicle") on or about November 1, 2022 from Larry H Miller Chrysler Jeep Dodge Ram Albuquerque in Albuquerque, New Mexico. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

202. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

203. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

204. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

205. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

206. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

207. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs

suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

208. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**NEW YORK PLAINTFFS**

**Joseph Battin**

209. Plaintiff Joseph Battin is a citizen and resident of the State of New York who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYD61N8717498 (hereinafter, the "Vehicle") on or about December 6, 2022 from West Herr Jeep of Orchard Park in Orchard park, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

210. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

211. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the

Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

212. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

213. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA’s recall instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle’s range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

214. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery

would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

215. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

216. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**<u>Glen Blaunstein and Terri Blaunstein</u>**

217. Plaintiffs Glen Blaunstein and Terri Blaunstein are citizens and residents of the State of New York who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYE6XN8716090 on or about November 21, 2022 from Hudson Valley CDJR in Newburgh, New York and a 2022 Jeep Wrangler 4xe, VIN 1C4JJXR6XNW212376, on or about May 4, 2022 from Suresky CDJR in Goshen, New York (hereinafter, the "Vehicles"). Plaintiffs purchased the vehicles for personal, family or household use. Plaintiffs always used the vehicles in the normal and expected manner.

218. Plaintiffs made the decision to purchase the Vehicles after considering FCA's representations about the vehicles, including the reported electric-only range and eMPG.

Plaintiffs chose the Vehicles based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicles, including their electric batteries, would be merchantable and fit for their ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

219. Prior to Plaintiffs' purchases, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicles. Plaintiffs reasonably expected that the Vehicles, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicles would be capable of being charged without compromising its safety or exposing the Vehicles to a risk of fire. Plaintiffs reasonably expected that the Vehicles could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicles would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

220. The Vehicles had less than 100,000 miles and was still covered by the implied warranty when the vehicles was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicles had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

221. As a result of the defects, Plaintiffs' Vehicles were subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicles' electric battery. As a result, the range of Plaintiffs' Vehicles

was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicles suffered, the vehicles' range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicles outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicles to the elements.

222. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicles. Had Plaintiffs known that the Vehicles presented a risk of a catastrophic fire, that the use of the Vehicles' electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicles outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicles to the weather and the elements, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicles' electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for it.

223. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicles, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicles' acquisition.

224. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Michael Christiano**

225. Plaintiff Michael Christiano is a citizen and resident of the State of New York who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB69N8757251 (hereinafter, the "Vehicle") on or about December 31, 2022 from Bedford CDJR in Bedford Hills, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

226. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

227. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the

Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

228. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

229. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

230. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

231. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

232. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**William Clark**

233. Plaintiff William Clark is a citizen and resident of the State of New Jersey who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB68N8721650 (hereinafter, the "Vehicle") on or about November 30, 2022 from Sawyer Motors in Saugerties, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

234. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

235. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

236. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

237. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

238. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

239. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

240. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Howard Kaplan**

241. Plaintiff Howard Kaplan is a citizen and resident of the State of New York who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYE63N8761713 (hereinafter, the

"Vehicle") on or about December 1, 2022 from Huntington CDJR in Huntington, New York. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

242. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

243. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

244. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

245. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

246. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

247. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

248. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Avi Mandel**

249. Plaintiff Avi Mandel is a citizen and resident of the State of New York who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYD6XN8724336 (hereinafter, the "Vehicle") on or about December 23, 2022 from South Shore Chrysler Dodge Jeep Ram in Inwood, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

250. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

251. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in

accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

252. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

253. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

254. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that

the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

255. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

256. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 27, 2026.

**AJL Design and Installation, Inc.**

257. Plaintiff AJL Design and Installation, Inc. is a New York corporation that purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYE6XN8735657 (hereinafter, the "Vehicle") on or about November 17, 2022 from Brown's of Bellport INC in Medford, New York. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

258. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff

chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

259. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

260. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

261. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle

was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

262. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

263. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

264. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Selvia Muzha**

265. Plaintiff Selvia Muzha is a citizen and resident of the State of New York who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP63PW594384 (hereinafter, the "Vehicle") on or about December 29, 2022 from Security CDJR in Amityville, New York. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

266. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

267. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the

Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

268. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

269. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

270. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less

for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

271. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

272. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Randy Raetz**

273. Plaintiff Randy Raetz is a citizen and resident of the State of New York who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR68PW704214 (hereinafter, the "Vehicle") on or about November 1, 2022 from Victor CDJR in Victor, New York. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

274. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

275. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

276. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

277. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

278. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

279. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

280. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Geoffrey Terwilliger**

281. Plaintiff Geoffrey Terwilliger is a citizen and resident of the State of New York who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP68PW524136 (hereinafter, the "Vehicle")

on or about November 1, 2022 from Canandaigua CDJR in Canandaigua, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

282. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

283. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

284. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

285. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

286. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

287. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

288. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Athena Villegas**

289. Plaintiff Athena Villegas is a citizen and resident of the State of New York who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB68N8756057 hereinafter, the "Vehicle") on or about December 9, 2022 from Eastchester CDJR in Bronx, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

290. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

291. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

292. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

293. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

294. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

295. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

296. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

**Phillip Monte**

297. Plaintiff Phillip Monte is a citizen and resident of the State of New York who leased a 2024 Jeep Wrangler 4xe, VIN 1C4RJXR67RW180592 hereinafter, the "Vehicle") on or about May 22, 2024 from Garden City CDJR in Hempstead, New York. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

298. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

299. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

300. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

301. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

302. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

303. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

304. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Louis Simpson**

305. Plaintiff Louis Simpson is a citizen and resident of the State of New York who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR65MW643139 (hereinafter, the "Vehicle") on or about July 25, 2025 from Brooklyn CDJR in Brooklyn, New York. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

306. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

307. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the

Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

308. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

309. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

310. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from

other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

311. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

312. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated September 14, 2026.

**Benjamin Cooper and Georgiana Cooper**

313. Plaintiffs Benjamin Cooper and Georgiana Cooper are citizens and residents of the State of New York who leased a 2023 Jeep Grand Cherokee 4xe, VIN 1C4RJYB67PC665586, and a 2024 Jeep Wrangler 4xe, VIN 1C4RJXN6XRW141338, on or about August 22, 2023, from Empire CDJR of West Islip in West Islip, New York (hereinafter, the "Vehicles"). Plaintiffs purchased the vehicles for personal, family or household use. Plaintiffs always used the vehicles in the normal and expected manner.

314. Plaintiffs made the decision to lease the Vehicles after considering FCA's representations about the vehicles, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicles based on the vehicle's represented electric-only range, eMPG, hybrid

features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the Vehicles' alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the Vehicles, Plaintiffs relied on FCA's implied warranty that the vehicles, including their electric batteries, would be merchantable and fit for their ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

315. Prior to Plaintiffs' leases, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicles. Plaintiffs reasonably expected that the Vehicles, including their electric batteries, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicles would be capable of being charged without compromising their safety or exposing the Vehicles to a risk of fire. Plaintiffs reasonably expected that the Vehicles could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicles would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

316. The Vehicles had less than 100,000 miles and was still covered by the implied warranty when the vehicles were leased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicles had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

317. As a result of the defects, Plaintiffs' Vehicles were subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicles' electric battery. As a result, the range of Plaintiffs' Vehicles was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the

acceleration of the Vehicles suffered, the Vehicles' range was diminished, and the eMPG of the Vehicles was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicles outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicles to the elements.

318. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicles. Had Plaintiffs known that the Vehicles presented a risk of a catastrophic fire, that the use of the Vehicles' electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicles outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicles to the weather and the elements, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicles' electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them.

319. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicles, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicles' acquisition.

320. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 22, 2026.

## UTAH PLAINTIFFS

### Scott Beckstrand and Carrie Beckstrand

321. Plaintiffs Scott Beckstrand and Carrie Beckstrand are citizens and residents of the State of Nevada who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP6XMW716539 (hereinafter, the "Vehicle") on or about May 2, 2024 from Stephen Wade CDJR in St. George, Utah. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

322. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

323. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably

expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

324. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

325. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

326. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid

substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

327. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

328. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Max Coulliette**

329. Plaintiff Max Coulliette is a citizen and resident of the State of Utah who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR69MW630037 (hereinafter, the "Vehicle") on or about March 11, 2024 from AutoSavvy in Lindon, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

330. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

331. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

332. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

333. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

334. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

335. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

336. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated September 30, 2026.

**Randy Cummins**

337. Plaintiff Randy Cummins is a citizen and resident of the State of Utah who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP67NW163012 (hereinafter, the "Vehicle")

on or about September 1, 2025 from Doug Smith Chrysler Dodge Jeep in American Fork, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

338. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

339. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

340. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

341. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

342. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

343. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

344. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Travis Foster**

345. Plaintiff Travis Foster is a citizen and resident of the State of Utah who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR65PW646322 (hereinafter, the "Vehicle") on or about August 18, 2025 from Andersons Motors Company in Salt Lake City, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

346. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

347. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

348. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

349. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

350. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

351. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

352. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Greg Garrick**

353. Plaintiff Greg Garrick is a citizen and resident of the State of Utah who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXN66PW592633 (hereinafter, the "Vehicle") on or about May 29, 2023 from Doug Smith Chrysler Jeep Dodge in American Fork, Utah. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

354. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

355. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

356. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

357. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

358. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

359. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

360. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jeffrey Ingleby**

361. Plaintiff Jeffrey Ingleby is a citizen and resident of the State of Utah who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR64MW738792 (hereinafter, the "Vehicle") on or about February 11, 2025 from Low Book Sales of Lindon in Lindon, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

362. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

363. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the

Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

364. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

365. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

366. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from

other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

367. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

368. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jeramy Johnson**

369. Plaintiff Jeramy Johnson is a citizen and resident of the State of Utah who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP64NW171679 (hereinafter, the "Vehicle") on or about November 1, 2023 from Anne Valae Fillmore in Richfield, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

370. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

371. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

372. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

373. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

374. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

375. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

376. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated June 26, 2026.

**Mitchele Krull and Rachel Krull**

377. Plaintiffs Mitchele Krull and Rachel Krull are citizens and residents of the State of Washington who leased, then purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP66MW870231 (hereinafter, the "Vehicle") on or about November 1, 2021 from Doug Smith CDJR - American Fork in American Fork, Utah. Plaintiffs leased, then purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

378. Plaintiffs made the decision to lease to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing, then purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

379. Prior to Plaintiffs' lease to purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably

expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

380. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased, then purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

381. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

382. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing, then purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased, then purchased the

Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have leased, then purchased the Vehicle or would have paid substantially less for it.

383. At the time of the lease to purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased, then purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

384. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Nicole Murray**

385. Plaintiff Nicole Murray is a citizen and resident of the State of Utah who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP63MW783435 (hereinafter, the "Vehicle") on or about November 9, 2024 from Karl Malone CDJR in Heber City, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

386. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

387. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

388. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

389. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

390. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

391. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

392. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Tharold Northup and Brenda Northup**

393. Plaintiffs Tharold Northup and Brenda Northup are citizens and residents of the State of Utah who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP63PW554905 (hereinafter, the

"Vehicle") on or about August 29, 2023 from Young Automotive Group in Layton, Utah. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

394. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

395. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

396. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

397. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

398. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it.

399. At the time of the lease, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

400. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Richard Pollock**

401. Plaintiff Richard Pollock is a citizen and resident of the State of Utah who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP65MW848317 (hereinafter, the "Vehicle") on or about January 20, 2025 from Ken Garff West Valley CDJR in West Valley City, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

402. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

403. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

404. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

405. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

406. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

407. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

408. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**William Rader**

409. Plaintiff William Rader is a citizen and resident of the State of Utah who leased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP67NW212404 (hereinafter, the "Vehicle") on or about May 25, 2022 from Larry H. Miller CDJR in Riverdale, Utah. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

410. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

411. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

412. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

413. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

414. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

415. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

416. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**William Sorensen**

417. Plaintiff William Sorensen is a citizen and resident of the State of Utah who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP6XNW279238 (hereinafter, the "Vehicle") on or about September 21, 2022 from Stephen Wade CDJR in St George, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

418. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

419. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the

Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

420. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

421. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

422. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from

other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

423. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

424. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated June 26, 2026.

**Roxanne Weatherhead**

425. Plaintiff Roxanne Weatherhead is a citizen and resident of the State of Utah who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP62MW704515 (hereinafter, the "Vehicle") on or about June 9, 2022 from Larry H Miller, Jeep in Riverdale, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

426. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

427. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

428. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

429. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

430. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

431. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

432. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated September 14, 2026.

**Robert Zaugg and Amanda Payne-Zaugg**

433. Plaintiffs Robert Zaugg and Amanda Payne-Zaugg are citizens and residents of the State of Utah who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXR68NW154493 on or about March 28, 2022 from Ken Garff West Valley CDJR Fiat in West Valley, Utah as well as a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP65MW716691, on or about July 30, 2021 from Salt Lake Valley Chrysler Dodge Jeep Ram in Salt Lake City, Utah. Plaintiffs purchased the vehicles for personal, family or household use. Plaintiffs always used the vehicles in the normal and expected manner.

434. Plaintiffs made the decision to purchase the Vehicles after considering FCA's representations about the vehicles, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicles based on the vehicles' represented electric-only range, eMPG, hybrid features and safety (including, without limitation, their ability to be free from a risk of battery fire and safely charged to 100%), the vehicles' alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicles, Plaintiffs relied on FCA's implied warranty that the vehicles, including their electric batteries, would be merchantable and fit for their ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

435. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicles. Plaintiffs reasonably expected that the Vehicles, including their electric batteries, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicles would be capable of being charged without compromising their safety or exposing the Vehicles to a risk of fire. Plaintiffs reasonably expected that the Vehicles could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably

expected that the Vehicles would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

436. The Vehicles had less than 100,000 miles and was still covered by the implied warranty when the vehicles were purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicles had less than 100,000 miles and were still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

437. As a result of the defects, Plaintiffs' Vehicles were subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicles' electric batteries. As a result, the range of Plaintiffs' Vehicles was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicles suffered, the vehicles' range was diminished, and the eMPG of the Vehicles was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicles outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicles to the elements.

438. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicles. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicles' electric batteries would be prohibited or that Plaintiffs would be forced to park the Vehicles outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicles to the

weather and the elements, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicles' electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them.

439. At the time of the purchases, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicles, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisitions and suffered incidental, consequential and actual damages after the Vehicle' 'acquisitions.

440. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**John Carlson**

441. Plaintiff John Carlson is a citizen and resident of the State of Utah who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR61PW565740 (hereinafter, the "Vehicle") on or about October 26, 2022 from Dough Smith CDJR in American Fork, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

442. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality

vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

443. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

444. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

445. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which

Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

446. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

447. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

448. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Sarah Ervin**

449. Plaintiff Sarah Ervin is a citizen and resident of the State of Utah who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP6XNW277618 (hereinafter, the "Vehicle") on or about July 29, 2022 from Ken Garff West Valley CDJR in West Valley City, Utah. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

450. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

451. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

452. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

453. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

454. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

455. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

456. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated October 19, 2026.

**WYOMING PLAINTIFF**

**Katrina Bears**

457. Plaintiff Katrina Bears is a citizen and resident of the State of Wyoming who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP69PW557579 (hereinafter, the "Vehicle") on or about November 1, 2022 from White Energy Motors in Gillette, Wyoming. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

458. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

459. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

460. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

461. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

462. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

463. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition

464. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated June 30, 2026.

**Defendant**

465. Defendant FCA US, LLC ("FCA") formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware,

and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

466. FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

467. FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the United States and worldwide. FCA and/or its agents designed and manufactured Plaintiff's Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to Plaintiffs' Vehicles, with the intent that such documents be reviewed and relied on by purchasers such as Plaintiff. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## VENUE AND JURISDICTION

468. The Court has diversity jurisdiction because Plaintiffs and FCA are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

469. This Court also has original jurisdiction to hear this case by virtue of 15 U.S.C. § 2310(d)(1)(A), the Magnuson-Moss Warranty Act, conferred under 28 U.S.C. § 1131. The amount in controversy exceeds $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

470. This Court has personal jurisdiction over FCA because FCA is a Delaware corporation and thus a citizen of Delaware. FCA conducts substantial business in this District. There are sufficient minimum contacts between FCA and Delaware such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

471. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because FCA is incorporated in this District , conducts substantial business in this District and is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

472. FCA markets and sells the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe (collectively, the "Vehicles") as safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicles.

473. This action arises out of FCA's failure to disclose and then adequately repair two uniform and widespread defects in 2020-2026 Jeep Wrangler 4xe and 2022-2026 Jeep Grand Cherokee 4xe vehicles (hereinafter "Defective Vehicles" or "Vehicles"). The first defect is in the lithium-ion battery (hereinafter the "Defective Battery") in the Jeep Vehicles that has led to numerous fires, safety recalls and guidance from FCA that imposes highly restrictive limitations on consumers' use of the vehicles. The defect causes the high voltage battery to overheat, which can result in catastrophic and destructive fires, resulting in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. As a result of the Battery Defect, FCA issued recall nos. B9A, 95B and 68C between November 2023 and October 2025.

474. The second defect manifests when the Vehicles automatically, improperly, and frequently enter and remain stuck in the Fuel and Oil Refresh Mode ("FORM") for extended

periods of time, which makes electric-only or electric assisted driving impossible (the "FORM Defect").

**The development and marketing of the Defective Vehicles.**

475. The Jeep Wrangler and Jeep Grand Cherokee are popular sport utility vehicles that FCA designs, manufactures, and sells under the Jeep brand. The Jeep brand traces its lineage to the original U.S. military Jeeps that were produced during World War II.

476. The original Jeep Cherokee was introduced in 1975 as a "a sporty, two-door version of the Wagoneer and featured bucket seats, a sports steering wheel, and racy detailing designed to appeal to younger, more adventurous drivers." In 1984, the "all-new" Jeep Cherokee was re-introduced as "the first compact four-door SUV, first uniframe construction, and first full-time 4x4 system with shift-on-the-fly capability."

477. In the 1990s, the Jeep brand continued to introduce vehicles that met consumer desires for "sporty" and "capable" sport utility vehicles (SUVs), including several iterations of the Jeep Wrangler and Grand Cherokee models. In 1993, Jeep introduced the Jeep Grand Cherokee as a mid-sized luxury SUV.

478. A few years later in 1999, the Jeep Brand also released the "the new Grand Cherokee (WJ)," which it "marketed as the most capable SUV ever." In 1997, the Jeep brand added the "super-capable Wrangler (TJ) with its new coil suspension" to its lineup.

479. In the past two decades, sensitivity to higher fuel prices and increased concern about the negative environmental effects of gas-powered vehicle emissions have resulted in a trend away from the gas-guzzling, SUV-heavy vehicle lineups that dominated the end of the 20th century. In response, manufacturers shifted towards electrification and production of hybrid-electric vehicles, which offer greater gas mileage and less emissions.

480. In 2020, FCA announced the Jeep plug-in hybrid Wrangler 4xe in response to these trends and in an effort to mitigate the poor gas mileage caused in part by its past designs. In 2022, FCA added the Jeep Grand Cherokee 4xe to its lineup, using the same 4xe moniker it used with the Wrangler 4xe. The 4xe (or "four-by-e") name is a play on the Jeep brand's reputation for 4x4 vehicles that highlights the Defective Vehicles' rugged four-wheel drive and modern electric capabilities.

481. FCA pervasively advertised the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe as offering similar performance and capability as the gas-powered equivalents, but with all the environmental and mileage benefits of a plug-in hybrid electric battery.

482. FCA also pervasively represented that plug-in hybrid-electric vehicles like the Defective Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Defective Vehicles do not produce any of the noxious tailpipe emissions (such as nitrogen oxides and other smog-forming pollutants that are harmful to human health, and greenhouse gases, such as carbon dioxide and methane) that vehicles with internal combustion engines produce.

483. FCA knew that one of its largest customer bases are outdoor enthusiasts, who are often invested in issues such as climate change and environmental protection. It explicitly sought to exploit these consumer desires for a greener vehicle in their marketing. As explained by an FCA marketing executive: "With Jeep, you have the DNA of adventure and freedom, meaning that our customer already is in a relationship with the planet. . . . But some are maybe 'cheating' in the sense that they don't want to think about the fact that internal-combustion vehicles pollute. Some are in an open relationship with the planet but like combustion cars. And some are in true love

with the planet and nature, and these are the consumers we want to start with" in promoting the Wrangler 4xe.

484. FCA also announced the Wrangler 4xe with a broadly disseminated advertisement narrated by Carl Sagan, a noted science educator and climate change activist. It concluded by showing the 4xe climbing a mountain and describing it as "the first-ever electric Wrangler."

485. In addition to embracing the environmental benefits of reduced gas consumption, Jeep also pervasively advertised the plug-in hybrid-electric design as a performance enhancer. When working together, the hybrid and electric power sources are supposed to provide more power and torque than Jeeps with traditional internal combustion engines, giving the Defective Vehicles faster acceleration and better performance.

486. For example, FCA advertised that the 2021 Jeep Wrangler output was capable of 470 pound-feet (lb.-ft.) of torque at 3,000 revolutions per minute (rpm) and 375 horsepower (hp) at 5,250 revolutions per minute, all while achieving 49 MPGe. By comparison, the lower-cost, gas-powered 2021 Jeep Wrangler with a 2.0 liter turbocharged four-cylinder gas engine could only put out a relatively meager 295 lb.-ft. of torque and 270 hp, with a combined city and highway gas mileage of 21 mpg.

487. FCA similarly touted the Jeep Grand Cherokee 4xe's performance and range numbers. At release, FCA represented that: "Overall, the 4xe system delivers 375 horsepower (280 kW) and 470 lb.-ft. (637 Nm) of torque. The Grand Cherokee 4xe, targeting an estimated 25 miles (40 km) of all-electric range, returns an estimated 57 MPGe and has an estimated total range of more than 440 miles (708 km)." FCA reassured consumers, "Don't let the near-silence of all-electric operation fool you—the legendary capabilities of Grand Cherokee still roar beneath this hood."

488. FCA also represented that the Grand Cherokee 4xe was all of what its gas-powered predecessor was and more because it was "designed and engineered to deliver even more of what has made the Grand Cherokee a true global icon in the premium SUV segment, including legendary Jeep 4x4 capability, class-leading space and versatility and advanced safety features."

489. In introducing the Defective Vehicles, Christian Meunier, the then-Global President of the Jeep Brand, stated: "Our Jeep 4xe vehicles will be the most efficient, responsible and capable that the brand has ever created." FCA's pervasive marketing messaging for the Defective Vehicles effectively conveyed to consumers that they could have the best of all worlds—an adventurous 4x4 vehicle that was also emissions friendly and technology driven. Or, as FCA puts it: "Yes, you can have both."

490. The notion that the Defective Vehicles represented the best of all worlds was repeated in literature directed at potential buyers. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe states that the vehicle includes a "17-kwh Battery" and "is a shining example of hybrid innovation, handing you tomorrow's progressive technology, today," while also providing "the rugged, open-air freedom and legendary capability that Jeep Wrangler is revered for, the world over."

491. In addition to highlighting the off-road capabilities of the Jeep Wrangler 4xe, FCA also pervasively marketed the vehicle as fit for city driving, especially in all-electric mode. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe highlighted how the driver could choose between different modes of the hybrid drivetrain under the banner of "POWER x2," including an electric-only mode and an "E-SAVE" mode for "low-emission zones in cities."

492. FCA published similar messaging and advertising about the Grand Cherokee 4xe, which likewise features a 17-kwh HV Battery and dual electric motor setup like the Wrangler 4xe.

FCA again advanced the notion that the Jeep Grand Cherokee 4xe, like the Wrangler 4xe before it, was the best of all worlds.

493. FCA has continually marketed the Defective Vehicles to gas-conscious consumers by making representations about the efficiency of both vehicles compared with their gas-powered equivalents. This includes, among other things, claiming that the Jeep Grand Cherokee 4xe "has the lowest estimated annual fuel cost of any Grand Cherokee ever," and that by buying the vehicle, they could bid "goodbye to the gas light."

494. FCA also repeatedly emphasized in its marketing and other pervasive statements the performance capabilities of the Jeep Wrangler 4xe in all-electric mode. In 2021, FCA announced plans to install Jeep-branded EV charging stations at popular off-road trailheads, including in Moab, Utah; Big Bear, California; and the Rubicon Trail in Pollock Pines—the namesake of one of the 4xe trim levels. Alongside this announcement, FCA touted that, "[w]ith 49 MPGe and 21 miles of all-electric range, the Jeep Wrangler 4xe can conquer even the toughest trails with zero emissions."

495. Notably, the advertised 49 eMPG is only achievable in all-electric mode. Without the ability to charge the vehicle, the 2023 Jeep Wrangler 4xe can achieve only 20 MPG in hybrid mode and the Grand Cherokee only 23 MPG in hybrid mode. Thus, the all-electric mode and convenience of charging at home are central to the value proposition of the Defective Vehicles. To that end, FCA highlighted the convenience of charging inside or near the home. FCA included a 25-foot 110v charger in the purchase of every 4xe vehicle. The relatively limited range of the cord implied that the vehicle was safe to charge within or near the owner's home. FCA also impliedly represented to each consumer that frequent charging was safe to do over and over, by

stating in the manual that "[l]ithium-ion batteries can be recharged and discharged thousands of times."

496. FCA portrayed the Defective Vehicles as plug-in hybrid SUVs capable of running off either gasoline or electricity. The Vehicles "pair a traditional gas engine with … incredible electric motor performance," providing drivers with the option to operate their vehicles using only the electric motor, only the gasoline internal combustion engine, or as a hybrid. "Electric mode" is touted as allowing for "nearly zero tailpipe emissions up to highway speeds," and FCA boasts that the Wrangler 4xe "can run on this mode for a distance of up to 21 total miles on a full charge."

497. The purported benefits of the plug-in hybrid-electric design came at a hefty premium to consumers: the Jeep Wrangler and Grand Cherokee 4xe models cost thousands of dollars more than similarly equipped Jeep Wranglers and Grand Cherokees with conventional, non-hybrid internal combustion engines. And while FCA highlighted the electric battery features to justify this premium cost, FCA's marketing never disclosed to consumers that the Defective Vehicles were equipped with dangerous batteries susceptible to fire, even when the vehicle is turned off and not charging. Nor did FCA's marketing disclose to consumers that they would not be able to charge their vehicles or park them indoors due to the Defective Battery and resulting fire risk.

498. FCA also touted the array of safety features in the Defective Vehicles. For example, the vehicle brochure for the 2022 Jeep Wrangler 4xe highlighted its "advanced safety & security systems" and states, "when it comes to your well-being on the road Jeep Wrangler is ready and willing to stand as a constant guardian." FCA's marketing materials repeatedly emphasized the vehicles' safety, durability, and reliability, evidencing the materiality of these features to buyers. The brochures for the Defective Vehicles prominently advertised their advanced safety

features: They also boasted of the vehicles' superior quality and workmanship. However, FCA never disclosed the existence of the Battery Defect.

499. Without the ability to charge the Defective Vehicles, consumers cannot make use of the much-advertised "all-electric" and "e-save" modes. The only practically available mode without plug-in charging capability is "hybrid," which is actually less fuel efficient than the gas-powered 4xe. As noted in Car and Driver, "[t]o get the full fuel-economy benefit [of the 2021 Wrangler 4xe], you'll have to stay close to home and plug in often. Once the battery has been depleted, the 4xe actually gets worse fuel economy than a Wrangler powered by the turbo four with none of the plug-in-hybrid hardware (20 versus 22 mpg combined). Blame the extra 800 pounds that the 4xe carries wherever it goes."

500. After extensively advertising the Defective Vehicles as a fuel-efficient, environmentally-friendly alternative since launch, the Wrangler 4xe -- weighed down by its underutilized electric motors and battery -- is actually slightly less fuel efficient than its lighter, gas-powered cousin. The Grand Cherokee 4xe with an unutilized HV Battery suffers from the same issues. The promise of FCA's various advertisements was thereby left unrealized. Certainly, FCA never disclosed in these numerous commercials or on its website that the Defective Vehicles would consume more fuel (or about the same amount of fuel) than its significantly less expensive gas-powered equivalent if the Defective Vehicles' hybrid and electric features could not be used as intended. By depriving Plaintiffs of their ability to charge their vehicles frequently and conveniently, FCA deprived them of a major value-proposition for the Defective Vehicles: less fuel consumption.

501. FCA also described the Wrangler 4xe as "the most capable, technically advanced and eco-friendly Wrangler ever." The Wrangler 4xe boasted "375 horsepower, an EPA fuel

economy of 49 MPGe with the battery charged, and 21 miles of guilt-free electric driving before the gas engine kicks on" and promised "to combine contradictory attributes—power and efficiency—into a single product that would have been unthinkable just 10 years ago." FCA prominently displays the Jeep Wrangler 4xe's 21-mile all-electric range throughout its website. As a result of this 21-mile electric driving range, FCA claimed that users would have the opportunity to "get around town solely on electric power. The Jeep Wrangler 4xe's product page states that its default setting is to run in Hybrid mode, meaning that it consumes electric power first until it runs out of charge, and then uses its gasoline engine. The Jeep Wrangler 4xe's product page also states that the Vehicle can run in Electric Mode, off of battery power alone, "[w]hen the battery has more than a 1% charge," and is capable of running in this mode "for up to 21 miles."

502. Like other hybrid and plug-in hybrid offerings, the Jeep Wrangler 4xe has both a gasoline engine and electric motors to enable gasoline-only, battery only—or a combination of the two—driving. In its promotional materials, FCA stated it had "logged over 1.4 million miles of real world on-road and off-road validation in all the corners of the world to make sure it's ready. We want to make sure this 'do anything' Wrangler does everything we promised."

503. After the success of the Jeep Wrangler 4xe, FCA introduced the Jeep Grand Cherokee 4xe for the 2022 model year. FCA describes the Grand Cherokee 4xe as "[u]ncompromising, sophisticated and remarkably capable[.]" The 2022 and 2023 Jeep Grand Cherokee 4xe "uses the same plug-inhybrid powertrain as the Wrangler [4xe]," including the same 400-volt, 17-kWh EV battery. In addition, as with the Wrangler 4xe, "[t]he battery pack system includes a dedicated heating and cooling circuit to keep the battery at its optimum temperature for best performance." The Grand Cherokee 4xe also features the same three driving modes as the Wrangler 4xe—Hybrid, Electric, and Esave—which provide the same functionality as its Wrangler

4xe counterpart. FCA's website emphasizes that the Grand Cherokee 4xe can achieve up to 25 miles of "pure EV driving" that helps Grand Cherokee 4xe owners "handle daily commutes."

504. As part of its ad campaigns, FCA put forth, and continues to put forth, advertisements showcasing the Defective Vehicles' ability to function in cold weather. The advertisements for the 4xe Vehicles go so far as to emphasize their durability in winter conditions, with ads showing the Vehicles on snowy roads or carrying ski and snowboard equipment. At no point did FCA inform the public that the ability to use the Defective Vehicle's all-electric mode would be compromised when the vehicles are driven in cold weather.

505. While FCA highlighted the all-electric range of the Vehicles in order to justify this premium cost, FCA's marketing never disclosed to consumers that the FORM Defect could render electric-only or electric assisted propulsion unavailable for long periods in cold weather that is typically found in Pennsylvania in the winter months and could interfere with the Vehicles' acceleration. In addition to concealing the FORM Defect, FCA actively mispresented the attributes and capabilities of the Vehicles by claiming, among other things, that the vehicles had been thoroughly tested.

506. Once the FORM Defect triggers, customers report having almost no access to electric-only or electric assisted vehicle operation for days, weeks, or months at a time, particularly, but not exclusively, during colder temperatures. The FORM Defect also interferes with the Vehicles' acceleration. The FORM Defect eliminates the benefits of the Vehicles' purportedly unique plug-in hybrid operations and creates a serious safety hazard. Plaintiffs paid a significant premium for the 4xe plug-in hybrid vehicles over the internal combustion-only versions of the same models, and therefore overpaid at the time of purchase for a feature that is not usable

as represented. Had Plaintiffs known of the FORM Defect, they would not have purchased the "hybrid" Vehicles or would have paid considerably less for them.

**The Vehicles are unreasonably dangerous due to the Battery Defect**

507. Lithium-ion batteries, such as the Defective Batteries used in the Defective Vehicles, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge." However, these batteries also have a well-documented history of fire issues. Safety concerns related to unexpected fires have been well documented, including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked, and are known to FCA. Unfortunately, FCA ignored safety concerns in order to market the Vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium-ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in a spontaneous ignition.

508. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.

509. The lithium-ion batteries in the Defective Vehicles were produced by Samsung SDI. Samsung SDI also manufactured the cells contained in batteries that allegedly caused fires in certain BMW and Ford models that have been recalled and subject to litigation. Those Ford and BMW recalls occurred in 2020, and upon information and belief, were caused by similar defective attributes as present here. According to BMW, the fires that led to recall of their PHEVs were caused by "thermal events" in the Samsung batteries.

510. As set forth below, FCA knew of the risk from the Defective Batteries from various sources, including: the well-documented risks of runaway propagation in lithium-ion batteries; NHTSA warnings of safety risks for lithium-ion batteries; the well-known risks of violent combustion from the NMC batteries used in the Defective Vehicles; the rigorous pre-launch testing FCA must have done on the Defective Vehicles' HV Battery and hybrid propulsion system; consumer complaints lodged with NHTSA, FCA, and publicized online; and similar battery fire issues in other hybrid electric vehicles, including FCA's Chrysler Pacifica PHEVs, and BMW and Ford-manufactured vehicles that use Samsung batteries for electric propulsion. Through this accumulated knowledge, FCA was aware of the serious danger of the Defective Batteries by the time it released the Defective Vehicles into the market, and certainly well before it issued its November 2023 recall.

511. The dangers inherent in lithium-ion electric car batteries were well-known to FCA before FCA sold the first Jeep PHEV. An October 2017 NHTSA Paper titled Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles explained:

- Li-ion battery technology is in the development stage and is not yet settled.
- As battery technology matures, the safety risks may increase as manufacturers attempt to obtain greater performance from existing chemistries and adopt new chemistries with less field experience. Increasing the bounds of performance implies operating the battery cells closer to limits where damage initiation and growth, leading to failure, can occur.
- The investigation conducted here demonstrates that there are numerous external events or processes in the life of a vehicle that could contribute to damage and failure of a Li-ion battery.
- Exothermic reactions and/or internal electrical shorts may be triggered by manufacturing defects . . . . If allowed to continue, these reactions or shorts can create conditions for self-heating within the cell; which grow to become uncontrolled increases in temperature and pressure (thermal runaway); and potentially end in venting or catastrophic failure of the cell.

- The assessment conducted here suggests that codes and standards for Li-ion battery vehicle systems are in their early development stages and immature at this time. The assessment suggests there are gaps and risks inherent in new and rapidly evolving technology including:
- Immature design and manufacturing standards;
- Immature safety systems integration requirements;
- Immature quality control requirements;
- Immature battery life cycle durability requirements.
- The results of this investigation show that Li-ion battery technology is a rapidly evolving technology field that is far from settled.
- The risks associated with Li-ion battery systems derive fundamentally from the novelty of the technology and limited long-term experience base with its safety performance.
- The ability to store and deliver substantial energy onboard a vehicle also implies that substantial energy can be released, with corresponding hazards, in the case of failure. In this case, the energy is stored electrochemically in batteries, rather than chemically as a fuel. While systems safety engineering can achieve levels of safety with Li-ion technology comparable to that of conventional fuels, the automotive industry does not have decades of experience with it and the same understanding that it has concerning conventional and alternative fuels. Nor is there a directly comparable technology that can provide a strong experience base for development of safety requirements.

https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf

512. A meta-review of lithium-ion battery ("LIB") fire safety, in an article published in the Journal of the Electrochemical Society, similarly stated:

- Although great success has been made on LIB commercialization, safety concerns have emerged because of unexpected fires. Some LIBs can display a tendency to ignite under abuse conditions and initiate fires or release toxic gases, thus creating a hazard. Moreover, as LIB technology moves to larger scales, from single cells to modules and packs, assuring their safety is an issue of growing severity and stakes. Exceeding the window of conditions in which LIBs operate safely can trigger thermal runaway (TR) and lead to fires.
- The temperature of the LIB reaches a critical value such that the reaction rate of an exothermic reaction increases the temperature, which in turn leads to further

acceleration of the reaction rate. This positive feedback of temperature increase is a sign of ignition and creates the fire hazards. Once a cell fails, the large amount of heat generated could trigger the thermal runaway of adjacent cells, contributing to fire propagation. Fires on the module and pack scales can release large amounts of heat and toxic gases and are difficult to suppress.

- Internal cell defects and internal faults that develop inside individual cells over time, causing the initiation of thermal runaway, are a major concern for all industries which demand methods and tools to reliably identify them.

- Another important concern that most industries agree on is the importance of the scale at which the safety testing takes place. The tests performed at component level might not be comparable to the tests performed at system level. Most of the research on safety is performed on cell or small modules, and similar data at pack and system is scarce.

- LIB failure can occur very rapidly after a cell is damaged, or slowly over a long period of time, causing delayed failure long after the damage is initiated. The time in between is usually referred to as the incubation period which can last from several hours to years, depending on the cause and failure mechanism. However, when a critical point is reached, usually governed by the balance between heat generation and heat dissipation from the cell and battery pack to the environment, the failure happens very fast.

https://iopscience.iop.org/article/10.1149/1945-7111/aba8b9

513. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called “cells.” Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte. In order to develop a battery that would deliver the advertised range, FCA developed a battery with “new cell design and chemistry.” The battery contains “nickel-rich lithium-ion chemistry” that purportedly provides “improved thermal performance over other chemistries” and requires a “smaller active cooling system for more efficient packaging.”

514. According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may

discharge or charge more quickly than colder cells), thermal management strategies must be integrated into the battery system design to monitor charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

515. Most electric and hybrid-electric vehicles, like the Defective Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge. However, lithium-ion batteries carry well-documented risks of combustion if they are improperly used by an auto manufacturer or placed in vehicles that are defectively designed or manufactured or placed in vehicles that are defectively designed or manufactured. Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Defective Vehicles. Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.

516. The HV Battery Systems placed in the Defective Vehicles by FCA are nickel-manganese-cobalt compositions. Importantly, "Ni[ckel]-rich NMC cathode materials are known to be susceptible to certain safety issues, such as thermal runaway and the risk of triggering battery fires." Thus, especially for NMC battery systems, it is imperative to set appropriate controls regarding maximum and minimum state of charge, maximum and minimum cell and/or overall voltage, appropriate current limitations, as well as robust cell temperature monitoring features.

517. In particular, NMC batteries are particularly susceptible to "lithium plating," a dangerous phenomenon that increases the thermal runaway risks posed by lithium-ion batteries. Lithium plating occurs when metallic lithium deposits on the anode surface form tree-like

structures called "dendrites." Those tree-like structures can then penetrate and damage the separator into the cathode and cause short circuiting, which in turn sparks a battery fire.

518. Dendrite formation—a form of internal physical damage to the battery—can occur as a result of repeated use and/or charging of the battery or its cells outside of manufacturer specifications. The effect of dendrite formation that leads to increased risk of short-circuit and thermal runaway is therefore cumulative; it increases as the battery or its cells are repeatedly subjected to improper use and/or charging conditions.

519. Significantly, the documented fires in the Defective Vehicles do not appear to be the result of external damage or misuse by the consumer. Upon information and belief, all reported fires to date have resulted from internal battery failure while the cars are parked and turned off, which points to either improper programming or internal issues within the battery.

520. Despite the known fire risk of the particular composition of these HV Batteries, FCA's design of the Jeep Wrangler 4xe and the Jeep Grand Cherokee 4xe placed the HV Battery directly inside the passenger compartment of the vehicle underneath the rear seat bench. The location of the battery within the cabin means that the combustion of the battery and outgassing of toxic chemicals occurs in the cabin of the Defective Vehicles, which at least one firefighting expert has described as a "terrible idea in my mind."

521. Just as important as the design and safety features used in a lithium- ion battery pack is rigorous pre-launch testing. The use of better safety systems and more rigorous testing would have prevented the reported battery fire incidents in the Defective Vehicles.

522. The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells."

On information and belief, FCA skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features of the Defective Vehicles—all to the benefit of FCA's bottom line and to the detriment of owners and lessees of the Defective Vehicles.

**<u>The Vehicles are unreasonably dangerous due to the FORM Defect</u>**

523. The Vehicles are also unreasonably dangerous due to the FORM Defect. When the Vehicles enter and remain in FORM, and the electric propulsion system is unavailable, the Vehicles' acceleration is compromised. This problem makes merging difficult and dangerous, especially when entering a highway. The danger is exacerbated because the Plaintiffs cannot determine when their Vehicles will enter FORM how long they will stay in FORM and what conditions will allow them to exit FORM. As a result, the acceleration of Plaintiffs' Vehicles is erratic and unpredictable, creating a serious safety risk.

**<u>FCA had advanced notice of the defects in the Defective Vehicles</u>**

**A. FCA had advanced notice of the Battery Defect.**

524. FCA accumulated knowledge of the automotive industry's issues with the HV Battery packs it placed in the Defective Vehicles. Both the Wrangler 4xe and the Grand Cherokee 4xe utilize 17 kwh high-voltage lithium-ion battery packs, which were manufactured by Samsung SDI America Inc. ("Samsung").

525. Samsung has a history of issues with its high-voltage EV batteries, of which FCA has had notice of since at least 2020. In August 2020, for instance, Ford recalled its Kuga PHEV due to a battery defect and owners were told not to charge the battery. The battery manufacturer was Samsung. Similarly, BMW recalled over 26,000 of its vehicles due to defective batteries whereby "the battery production process allowed impurities to enter the cells." And around 2022,

Samsung recalled more than 1,000 of its EV batteries (including in FCA vehicles) because of poor manufacturing quality.

526. FCA was also on notice of the Battery Defect because it accumulated knowledge of a similar defect in another FCA plug-in hybrid vehicle: the 2017-2018 Chrysler Pacifica plug-in hybrid minivan. Even before the first Jeep PHEV rolled off the lot, FCA began receiving reports of fires related to the HV battery system in Chrysler Pacifica Plug-in Hybrid, including a vehicle fire on April 23, 2019. Another occurred on June 15, 2019, where a Chrysler Pacifica exploded in front of a house while plugged in. The design of the particular parts of the Chrysler Pacifica plug-in that are related to the HV battery are similar to the analogous components in the Defective Vehicles. On February 11, 2022, FCA issued a recall for more than 16,700 of its 2017-2018 Chrysler Pacifica plug-in hybrids due to rising reports of fires in those vehicles. It stated that, "[a] vehicle may experience a fire, even with the ignition in the 'OFF' mode," much like the Defective Vehicles.

527. FCA's knowledge of the Chrysler Pacifica fires dates as far back as 2019, so the associated battery issues in those vehicles predated its release of the Defective Vehicles in 2020 and any sale of the Defective Vehicles. FCA manufactured both of these plug-in hybrid systems and was therefore on notice that similar HV Battery parts were likely to cause fires, especially if they were programmed to be used inconsistently with industry standard safety guidelines.

528. FCA had exclusive and superior knowledge of the battery defects and Plaintiffs could not reasonably discover the defects through reasonable diligence. Among other sources, FCA knew or should have known of the widespread battery defect through widespread industry knowledge of the dangers inherent in lithium-ion electric car batteries, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis

data, early reports of loss of propulsion in Jeep vehicles caused by low battery voltage, reports of fires caused by defective Jeep batteries, consumer complaints made to FCA's network of dealers and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, repair order and parts data received by FCA from FCA's network of dealers, recall notices, customer satisfaction notices ("CSNs"), technical service bulletins ("TSBs"), internal investigations and failure analyses, software updates, diagnostic software update vehicle data and NHTSA reports. Despite such knowledge, FCA suppressed the true facts in order to sell additional vehicles, avoid the cost of repairs, replacements or recalls, limit warranty claims and avoid bad press.

**B. FCA had advanced notice of the FORM Defect.**

529. FCA also had advanced notice of the FORM Defect through widespread pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, consumer complaints made to FCA's network of dealers and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, repair order and parts data received by FCA from FCA's network of dealers, recall notices, customer satisfaction notices ("CSNs"), technical service bulletins ("TSBs"), internal investigations and failure analyses, software updates, diagnostic software update vehicle data and NHTSA reports.

530. FCA stated in the 2021 manuals for the Defective Vehicles that the vehicles will enter FORM to maintain engine lubrication properties "if the system detects a stale fuel or aged oil condition after a long period without combustion engine operation." When this message appears, owners are unable to access electric-only or electric-assisted propulsion to drive their vehicles.

531. But the truth is that the defective nature of the Vehicles results in FORM manifesting far more often and for longer than is reasonable. Indeed, Class Vehicles owners report having little to no access to electric-only or electric-assisted operation for months on end. As a result, the Defect frequently deprives the user of access to electric-only or electric-assisted driving.

532. In January 2022, FCA issued Technical Service Bulletins ("TSBs") relating to the FORM Defect. One TSB indicated that FORM cycles may be extended due to an issue with the PCM software, and provides for reprogramming that module. However, another TSB stated that the FORM cycles were operating as designed.

533. The 2021 Jeep Wrangler 4xe manual stated, prior to its revision after the 2021 Jeep Wrangler 4xe went on sale that: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips." However, user experiences and FCA's own testing put FCA on notice that the Vehicles cold remain in FORM mode for up to 2.5 hours. User experiences and FCA's own testing also put FCA on notice that the FORM Defect was much more frequent and pronounced in cold weather environments. FCA concealed the true extent and nature of the FORM Defect from the public despite its advanced knowledge of the problem.

534. Even when FCA updated the owners' manuals for the Defective Vehicles, it continued to conceal the nature, extent and duration of the FORM Defect. Among other things, FCA failed to disclose the specific circumstances under which vehicles would enter FORM, the frequency with which Vehicle would enter FORM, the duration of time the Vehicles would remain in FORM or the circumstances under which the Vehicles would exit FORM.

**FCA had a duty to disclose the defects**

535. FCA had a duty to disclose the Defective Batteries and the FORM Defect as well as the safety risk caused by such defects because:

a. FCA was in a superior position to know the true state of facts about the Defective Vehicles, the Battery Defect and the FORM Defect and had exclusive knowledge of the defects based on sources not available to consumers;

b. Plaintiffs could not reasonably have been expected to learn or discover that their Vehicles were defective or had the Battery Defect or the FORM Defect;

c. FCA actively concealed the defects at issue, which were material facts of which it had exclusive knowledge;

d. FCA knew that Plaintiffs were not aware of the defects, that they could not reasonably have been expected to learn about or discover that their Vehicles were defective or had the Battery Defect or the FORM Defect, and that they would not have purchased the Vehicles, or would have paid substantially less for the Vehicles, had they been aware of the defects;

e. The existence of the defects was a material fact, pertaining to vehicle safety, that a reasonable consumer would consider highly material in determining whether to purchase or lease the subject vehicles and at what price; and

f. FCA made partial disclosures about the vehicles' range, the batteries' capabilities, the vehicles' safety and the vehicles' quality that were misleading without full disclosure of the defects.

Despite its duty to disclose, FCA actively concealed and failed to disclose the Battery Defect and FORM Defect.

**As a result of the Battery Defect, fires began to occur after the Vehicles were launched**

536. After FCA released the Defective Vehicles into the market, owners and lessees began complaining that their Defective Vehicles suddenly caught fire. According to FCA, between April and November 2023, at least eight Jeep Wrangler 4xes caught fire all while parked and turned off. According to FCA's recent 2024 Recall, an additional thirteen incidents occurred in Jeep Wrangler and Grand Cherokee 4xe's between April and July 2024. Numerous other fires were recorded in the NHTSA complaint database.

537. In addition to these incidents, FCA also had notice of the Defective Batteries through its buyback acquisition of Defective Vehicles and subsequent investigation. According to its 2023 Recall Part 573 Safety Recall Report, FCA requested buybacks of seven vehicles and received buybacks of two of those vehicles and disassembled the HV battery packs.

538. In addition to these earlier inspections, according to its Part 573 Recall Report for the more recent 2024 Recall, "FCA conducted further analysis of the battery packs from" certain Wrangler 4xe and/or Grand Cherokee 4xe Defective Vehicles that caught fire between April and July 2024.

539. All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Defective Vehicles. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

**Plaintiffs unknowingly purchased Defective Vehicles**

540. Plaintiffs made the decision to purchase their Vehicles after considering FCA's representations about the Vehicle, including the reported range and mileage. Plaintiffs chose their

Vehicles based on the Vehicles' represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the Vehicles, Plaintiffs relied on FCA's implied warranty that the vehicles, including their electric batteries, would be merchantable and fit for their ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

541. Prior to Plaintiffs' purchase of their vehicles, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicles. Plaintiffs reasonably expected that their Vehicles, including their electric batteries would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that their Vehicles would be capable of being charged without compromising their safety or exposing the vehicle to a risk of fire. Plaintiffs reasonably expected that their Vehicles would reliably operate in electric-only mode in all conditions and would be able to consistently achieve the advertised electric-only range. And Plaintiffs reasonably expected that their Vehicles would provide adequate and reliable acceleration.

542. The Vehicles had less than 100,000 miles and was still covered by the implied warranty when the Vehicles were acquired by Plaintiffs and the Vehicles were defective at that time. Moreover, the Vehicles had less than 100,000 miles and were still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect and FORM Defect within a reasonable time.

543. As a result of the Battery Defect and FORM Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defective Battery and FORM Defect and did not receive the benefit of the bargain after purchasing

the Vehicles. Had Plaintiffs known that the Vehicles presented a risk of a catastrophic fire and suffered from the FORM Defect, they would not have purchased the Vehicles or would have paid substantially less for them.

544. At the time of the purchase, Plaintiffs were unaware that their Vehicles had the Battery Defect and FORM Defect. Had Plaintiffs known the true facts about their Vehicles, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisitions and suffered incidental, consequential and actual damages after the Vehicle's acquisitions.

**FCA issued a series of ineffective recalls of the**
**Defective Vehicles as a result of the Battery Defect**

545. Despite FCA's actual and/or constructive knowledge of the serious risk of explosion and fire in the Defective Vehicles, it did nothing to remedy the problem or even warn consumers until its November 2023 recall.

546. According to the 2023 Recall Part 573 Recall Report that FCA sent to NHTSA on November 22, 2023, FCA's Technical Safety and Regulatory Compliance organization began investigating fire risk from the HV battery pack after receiving numerous reports of fires. By October 2023, FCA had conducted "two vehicle buybacks and . . . disassembled the HV battery packs. The modules and cells are undergoing additional analysis." FCA still has not disclosed the results of any such analysis. Finally, on November 22, 2023, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall" of the Defective Vehicles. The 2023 Recall, however, did not provide any fix for the Battery Defect. Four months later, FCA announced an attempted recall procedure in March 2024. But even after those months of delay, FCA admitted that it still had not identified the root cause of the Battery Defect.

547. Nevertheless, FCA self-servingly predicted in its communications with dealers that, "Very few vehicles [an estimated one percent] are expected to require HV battery replacement." FCA's rosy prediction for its 2023 Recall was off the mark. Defective Vehicles failed the recall procedure in unexpectedly high numbers. One online poll on a Jeep 4xe forum found that nearly half of respondents needed a replacement HV battery, with all but one still waiting on their battery at the time they responded to the poll.

548. According to FCA's final Quarterly Report to NHTSA regarding its 2023 Recall, as of July 26, 2024, roughly half of a "recall population of 32,125" vehicles actually received recall service. Unsurprisingly, given the large number of vehicles that ultimately failed recall service, consumers have reported waiting for months on end for their replacement HV Battery on various Jeep forums.

549. FCA Recall B9A was announced in November 2023. It applied to 2021-2023 Jeep Wrangler PHEVs. According to the recall notice, an internally failed HV battery could lead to a vehicle fire. Owners were instructed to refrain from charging their vehicles and to not park their vehicles near buildings, structures or other vehicles. At the time of the recall notice, the approved remedy, a software flash, was not available. The initial recall applied to approximately 32,000 vehicles.

550. In September 2024, FCA issued Recall 95B. The recall applied to 2020-2024 Jeep Wrangler PHEVs and 2022-2024 Jeep Grand Cherokee PHEVs. The new recall applied to subject vehicles even if they had already received the Recall B9A repair. According to FCA, the most likely root cause of the defective batteries in the Defective Vehicles was separator damage. At the time of the recall notice, the approved remedy, a software flash, was not available. The 2024 recall applied to approximately 154,000 vehicles.

551. In October 2025, FCA issued Recall 68C. The recall applied to 2020-2025 Jeep Wrangler PHEVs and 2022-2026 Jeep Grand Cherokee PHEVs. The new recall applied to subject vehicles even if they had already received the Recall B9A repair or the Recall 95B repair. At the time of the recall notice, the approved remedy, a software flash, was not available.

552. As FCA floundered in performing the various recalls, it continued to advise the Defective Vehicle owners and lessees "to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed." These instructions left the Defective Vehicle owners with three choices: (i) follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline (and potentially degrading their HV Batteries further by not charging them as per FCA's use guidelines); (ii) ignore FCA's instructions and risk disaster; or (iii) sell the vehicles at a substantial loss as a result of FCA's conduct.

**FCA has failed to remedy the FORM Defect**

553. Despite its longstanding knowledge of the FORM defect, FCA has failed to act to notify all Vehicle owners of its omissions, remedy its misrepresentations regarding the FORM Defect or implement a recall to remedy or eliminate the FORM Defect. In fact, it appears that FCA has only issued one TSB directly referencing the FORM Defect. Dated December 23, 2022, FCA's TSB only applies to 2022 Jeep Wrangler 4xe vehicles and is meant to address the following customer complaints: "Vehicle may not be able to enter electric mode driving while Fuel Oil Refresh Mode (FORM) is active[,]" and/or "FORM staying on too long." The TSB instructs dealer technicians to update the 2022 Jeep Wrangler 4xe's powertrain control module (PCM), the hybrid control processor (HCP), the auxiliary hybrid control processor (AHCP) also known as the Power

Inverter Module (PIM), and the Transmission Control Module (TCM). On information and belief, application of these updates has proved ineffective in remedying or ameliorating the FORM Defect.

554. FCA later issued a Customer Satisfaction Notification directed toward certain 2023 Jeep Wrangler 4xe owners. The Customer Satisfaction Notification instructs 2023 Jeep Wrangler 4xe owners to visit a dealership because "[t]he full electric mode on your vehicle may not be available due to an incorrectly enabled engine maintenance mode designed to protect your engine from failure due to diluted oil." The notification makes no mention of FORM, the conditions that may trigger it, or how the stated solution will remedy the problem. Rather than reveal the true nature and extent of the FORM Defect or implement a recall to remedy it, FCA has continued to conceal the extent of the problem.

**FCA's Implied Warranties**

555. Plaintiffs purchased their Vehicles from FCA's network of authorized dealers who were authorized sellers and distributors of the Defective Vehicles. Those dealers were and are FCA's authorized representatives for service and repair, including warranty repairs, of the subject vehicles. FCA intends for the dealers to sell its vehicles to consumers like Plaintiffs and the contracts between FCA and its authorized dealers, including the warranties, are made for the express benefit of the ultimate purchasers of the subject vehicles and not for the dealers. As a result, consumers, not FCA's dealers, are the intended third-party beneficiaries of all implied warranties between FCA and its dealers relating to the subject vehicles and those warranties are designed solely for the benefit of the ultimate consumers of the subject vehicles.

556. An implied warranty of merchantability also accompanied the sale and lease of the vehicles by operation of law under the UCC and Texas law.

557. Pursuant to the implied warranty, FCA warranted the Vehicles were merchantable under both the UCC and Texas law Act. A merchantable electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable vehicle can be safely used without a risk of an underhood fire.

558. FCA does not sell vehicles directly to consumers such as Plaintiffs but rather only through its authorized FCA dealers. Plaintiffs acquired the Vehicles from authorized FCA dealers.

559. FCA also does not directly provide the repairs or other services called for under the terms of FCA's warranties. Instead, FCA uses its authorized FCA dealers to both provide warranties to consumers who purchase or lease FCA vehicles and to perform repairs or other services under the terms of FCA's warranties.

560. As intended and directed by FCA, FCA's implied warranties were provided to Plaintiffs, the ultimate consumers, at the time they took delivery of his Vehicles and as part of the basis of the bargain. The sale of the Vehicle by FCA's authorized dealer created a direct transactional relationship between FCA and Plaintiffs. Since FCA provided an implied warranty to the ultimate consumer with the purchase or lease of the vehicle no further "privity of contract" is required to enforce the implied warranty. When deciding to acquire the Vehicles, Plaintiffs relied on FCA's implied warranty that the Vehicles.

561. Additionally and alternatively, Plaintiffs may enforce FCA's implied warranty of merchantability as an intended third-party beneficiary. The implied warranty of merchantability was and is intended solely for the benefit of Plaintiff, the owner of the Vehicle. Plaintiffs were and are the intended third-party beneficiary of those implied warranties. The dealers from whom

they purchased the Vehicles were not intended to be the ultimate consumer of the subject Vehicles and had no rights under the implied warranty applying to the Vehicles.

562. The implied warranties applicable to the subject Vehicles were intended for the benefit of the ultimate purchasers and owners of the vehicles. The implied warranties are applicable to original or subsequent owners and are transferrable from owner to owner.

563. The dealers from whom Plaintiffs purchased the subject Vehicles were not intended to be the ultimate consumer of the subject Vehicles, were not the intended beneficiary of the implied warranties applying to the Vehicles and had no rights under those warranties. Rather, the implied warranties were intended to benefit the ultimate consumers only.

## IDAHO CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

564. Idaho Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

565. Idaho Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

566. Idaho Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Idaho Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

567. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article

2 of the Uniform Commercial Code ("UCC"), as adopted by Idaho at Idaho Code § 28-2-101 *et. seq*.

568. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code § 28-2-101 *et. seq*.

569. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Idaho at Idaho Code § 28-2-314.

570. FCA provided Idaho Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

571. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

572. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

573. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Idaho Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

574. Idaho Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Idaho Plaintiffs.

575. Idaho Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Idaho Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

576. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints

they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Idaho Plaintiffs

577. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

578. Idaho Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Idaho Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Idaho Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

579. Idaho Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

580. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Idaho at Idaho Code § 28-2-101 *et. seq*.

581. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code § 28-2-101 *et. seq.*

582. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Idaho at Idaho Code § 28-2-314.

583. FCA provided Idaho Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which

they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

584. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

585. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

586. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

Idaho Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

587. Idaho Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Idaho Plaintiffs.

588. Idaho Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Idaho Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

589. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Idaho Plaintiffs

590. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

591. Idaho Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Idaho Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Idaho Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

## THIRD CAUSE OF ACTION-
## FRAUDULENT CONCEALMENT/FRAUD BY OMISSION

592. Idaho Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

593. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

594. Under Idaho law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

595. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made

its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Idaho Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

596. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Idaho Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

597. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Idaho Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

598. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Idaho Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

599. Idaho Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Idaho Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

600. As a result of FCA's omissions and concealments, Idaho Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of

purchase, out of pocket costs, and various consequential damages including mental anguish damages.

601. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Idaho Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FOURTH CAUSE OF ACTION - FRAUD BY AFFIRMATIVE MISREPRESENTATION

602. Idaho Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

603. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

604. Idaho Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Idaho Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

605. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Idaho Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FIFTH CAUSE OF ACTION-
## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
## (IDAHO CODE ANN. § 48-601 ET SEQ.)

606. Idaho Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

607. The Idaho Consumer Protection Act (Idaho CPA) prohibits deceptive business practices, including but not limited to (1) representing that goods have characteristics, uses, and benefits which they do not have; (2) representing that goods are of a particular standard, quality, and grade when they are not; (3) advertising goods with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. See IDAHO CODE ANN. § 48-603. FCA's aforementioned conduct violated this statute.

608. FCA is a "person" under IDAHO CODE ANN. § 48-602(1).

609. FCA's acts or practices as set forth above and below occurred in the conduct of "trade" or "commerce" under IDAHO CODE ANN. § 48-602(2).

610. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Idaho Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series

of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

611. FCA thus violated the ICFA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

612. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Idaho Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

613. Idaho Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

614. FCA had a duty to Idaho Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. Idaho Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that Idaho Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

615. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

616. The facts FCA concealed or did not disclose to Idaho Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Idaho Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

617. FCA's violations present a continuing risk to Idaho Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

618. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

619. Idaho Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's Idaho CPA violations. Idaho Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

620. Pursuant to IDAHO CODE ANN. § 48-608, the Idaho Plaintiffs seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff. The Idaho Plaintiffs also seek attorneys' fees and costs, and any other just and proper relief available under the Idaho CPA. The Idaho Plaintiffs also seek punitive damages against Defendant because

Defendant's conduct evidences an extreme deviation from reasonable standards. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

621. Idaho Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

622. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Idaho Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

623. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

624. At the expense of Idaho Plaintiffs, FCA received and retained a benefit from Idaho Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Idaho Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Idaho Plaintiffs for more than they were worth as a result of FCA's conduct.

625. Idaho Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Idaho Plaintiffs.

626. Idaho Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

627. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

628. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Idaho Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

629. Idaho Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

630. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

631. Idaho Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Idaho Plaintiffs to the position they occupied prior to dealing with FCA.

632. Idaho Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## NORTH DAKOTA CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

633. North Dakota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

634. North Dakota Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

635. North Dakota Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). North Dakota Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

636. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Dakota at N.D.C.C. § 41-02-01 *et. seq.*

637. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.D.C.C. § 41-02-01 *et. seq.*

638. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Dakota at N.D.C.C. § 41-02-31.

639. FCA provided North Dakota Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable

quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

640. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

641. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

642. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

North Dakota Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

643. North Dakota Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with North Dakota Plaintiffs.

644. North Dakota Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. North Dakota Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

645. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including North Dakota Plaintiffs

646. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

647. North Dakota Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to North Dakota Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. North

Dakota Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

648. North Dakota Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

649. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Dakota at N.D.C.C. § 41-02-01 *et. seq.*

650. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.D.C.C. § 41-02-01 *et. seq.*

651. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Dakota at N.D.C.C. § 41-02-31.

652. FCA provided North Dakota Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

653. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery

Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

654. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

655. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, North Dakota Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

656. North Dakota Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with North Dakota Plaintiffs.

657. North Dakota Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. North Dakota Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

658. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including North Dakota Plaintiffs

659. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

660. North Dakota Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to North Dakota Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. North Dakota Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION-**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

661. North Dakota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

662. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were

misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

663. Under North Dakota law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

664. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting North Dakota Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

665. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by North Dakota Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

666. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the North Dakota Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

667. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce North Dakota Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

668. North Dakota Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of North Dakota Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

669. As a result of FCA's omissions and concealments, North Dakota Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

670. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of North Dakota Plaintiffs. FCA's' conduct

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

671. North Dakota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

672. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

673. North Dakota Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, North Dakota Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

674. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of North Dakota Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT**
**(N.D.C.C. § 51-15.)**

675. North Dakota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

676. The North Dakota Consumer Fraud Act ("NDCFA") prohibits deceptive business practices, including but not limited to: (1) the act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice and (2) the act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition." N.D.C.C. § 51-15. FCA's aforementioned conduct violated this statute.

677. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to North Dakota Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled

out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

678. FCA thus violated the NDCFA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

679. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for North Dakota Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

680. North Dakota Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

681. FCA had a duty to North Dakota Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. North Dakota Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that North Dakota Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

682. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

683. The facts FCA concealed or did not disclose to North Dakota Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had North Dakota Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

684. FCA's violations present a continuing risk to North Dakota Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

685. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

686. North Dakota Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's NDCFA violations. North Dakota Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

687. Pursuant to N.D.C.C. § 51-15, the North Dakota Plaintiffs seek monetary relief against FCA in the amount of their actual damages to be determined at trial. The North Dakota Plaintiffs also seek attorneys' fees and costs, and any other just and proper relief available under

the NDCFA. The North Dakota Plaintiffs also seek treble damages under N.D.C.C. § 51-15-09 against FCA because its conduct was committed knowingly

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

688. North Dakota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

689. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled North Dakota Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

690. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

691. At the expense of North Dakota Plaintiffs, FCA received and retained a benefit from North Dakota Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to North Dakota Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to North Dakota Plaintiffs for more than they were worth as a result of FCA's conduct.

692. North Dakota Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of North Dakota Plaintiffs.

693. North Dakota Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

694. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

695. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to North Dakota Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

696. North Dakota Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

697. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

698. North Dakota Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return North Dakota Plaintiffs to the position they occupied prior to dealing with FCA.

699. North Dakota Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## NEW HAMPSHIRE CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

700. New Hampshire Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

701. New Hampshire Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

702. New Hampshire Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). New Hampshire Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

703. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Hampshire at N.H. Rev. Stat. Ann. § 382-A:2-101 *et. seq.*

704. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-101 *et. seq.*

705. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Hampshire at N.H. Rev. Stat. Ann. § 382-A:2-314 *et. seq.*

706. FCA provided New Hampshire Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes

for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

707. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

708. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

709. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

New Hampshire Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

710. New Hampshire Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with New Hampshire Plaintiffs.

711. New Hampshire Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. New Hampshire Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

712. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including New Hampshire Plaintiffs

713. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

714. New Hampshire Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to New Hampshire Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages.

New Hampshire Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

715. New Hampshire Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

716. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Hampshire at N.H. Rev. Stat. Ann. § 382-A:2-101 *et. seq.*

717. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-101 *et. seq.*

718. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Hampshire at N.H. Rev. Stat. Ann. § 382-A:2-314 *et. seq.*

719. FCA provided New Hampshire Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

720. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

721. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

722. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, New Hampshire Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

723. New Hampshire Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights

under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with New Hampshire Plaintiffs.

724. New Hampshire Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. New Hampshire Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

725. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including New Hampshire Plaintiffs

726. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

727. New Hampshire Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to New Hampshire Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. New Hampshire Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION-**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

728. New Hampshire Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

729. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

730. Under New Hampshire law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

731. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made

its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting New Hampshire Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

732. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by New Hampshire Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

733. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the New Hampshire Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

734. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce New Hampshire Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

735. New Hampshire Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of New Hampshire Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

736. As a result of FCA's omissions and concealments, New Hampshire Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

737. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of New Hampshire Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

738. New Hampshire Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

739. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

740. New Hampshire Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, New Hampshire Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

741. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of New Hampshire Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT**
**(N.H. REV. STAT. ANN. § 358-A:1 ET SEQ.)**

742. New Hampshire Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

743. The New Hampshire Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

744. The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including "but . . . not limited to, the following: … [r]epresenting that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. § 358-A:2. FCA's aforementioned conduct violated this statute.

745. FCA and the New Hampshire Plaintiffs are "persons" under N.H. REV. STAT. ANN. § 358-A:1.

746. FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. § 358-A:1.

747. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business,

FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to New Hampshire Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

748. FCA thus violated the New Hampshire CPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

749. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for New Hampshire Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

750. New Hampshire Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

751. FCA had a duty to Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. New Hampshire Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that New Hampshire Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

752. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

753. The facts FCA concealed or did not disclose to New Hampshire Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had New Hampshire Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

754. FCA's violations present a continuing risk to New Hampshire Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

755. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

756. New Hampshire Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's New Hampshire CPA violations. New Hampshire Plaintiffs have suffered

actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

757. Because FCA's willful conduct caused injury to the New Hampshire Plaintiffs' property through violations of the New Hampshire CPA, the New Hampshire Plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

758. New Hampshire Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

759. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled New Hampshire Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

760. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

761. At the expense of New Hampshire Plaintiffs, FCA received and retained a benefit from New Hampshire Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to New Hampshire Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to New Hampshire Plaintiffs for more than they were worth as a result of FCA's conduct.

762. New Hampshire Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of New Hampshire Plaintiffs.

763. New Hampshire Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

764. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

765. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to New Hampshire Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

766. New Hampshire Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

767. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

768. New Hampshire Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return New Hampshire Plaintiffs to the position they occupied prior to dealing with FCA.

769. New Hampshire Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## NEW MEXICO CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

770. New Mexico Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

771. New Mexico Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

772. New Mexico Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). New Mexico Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

773. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Mexico at N.M. Stat. Ann. § 55-2-101 *et. seq.*

774. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.M. Stat. Ann. § 55-2-101 *et. seq.*

775. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Mexico at N.M. Stat. Ann. § 55-2-314.

776. FCA provided New Mexico Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

777. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

778. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

779. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and

others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, New Mexico Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

780. New Mexico Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with New Mexico Plaintiffs.

781. New Mexico Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. New Mexico Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

782. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including New Mexico Plaintiffs

783. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

784. New Mexico Plaintiffs are entitled to relief because FCA’s breach of the implied warranty of merchantability was a producing cause of economic damages to New Mexico

Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. New Mexico Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

785. New Mexico Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

786. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Mexico at N.M. Stat. Ann. § 55-2-101 *et. seq.*

787. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.M. Stat. Ann. § 55-2-101 *et. seq.*

788. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New Mexico at N.M. Stat. Ann. § 55-2-314.

789. FCA provided New Mexico Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

790. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

791. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

792. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, New Mexico Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

793. New Mexico Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under

the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with New Mexico Plaintiffs.

794. New Mexico Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. New Mexico Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

795. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including New Mexico Plaintiffs

796. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

797. New Mexico Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to New Mexico Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. New Mexico Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION-**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

798. New Mexico Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

799. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

800. Under New Mexico law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

801. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made

its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting New Mexico Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

802. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by New Mexico Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

803. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the New Mexico Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

804. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce New Mexico Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

805. New Mexico Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of New Mexico Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

806. As a result of FCA's omissions and concealments, New Mexico Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of

purchase, out of pocket costs, and various consequential damages including mental anguish damages.

807. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of New Mexico Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

808. New Mexico Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

809. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

810. New Mexico Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, New Mexico Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

811. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of New Mexico Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FIFTH CAUSE OF ACTION-
## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
## (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*)

812. New Mexico Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

813. The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D). FCA's aforementioned conduct violated this statute

814. FCA and the New Mexico Plaintiffs are "person[s]" under N.M. STAT. ANN. § 57-12-2 in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

815. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to New Mexico Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

816. FCA thus violated the New Mexico UTPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

817. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for New Mexico Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

818. New Mexico Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

819. FCA had a duty to New Mexico Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. New Mexico Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that New Mexico Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

820. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

821. The facts FCA concealed or did not disclose to New Mexico Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had New Mexico Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

822. FCA's violations present a continuing risk to New Mexico Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

823. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

824. New Mexico Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's New Mexico CPA violations. New Mexico Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

825. Because FCA's unconscionable, willful conduct caused actual harm to the New Mexico Plaintiffs, the New Mexico Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

## SIXTH CAUSE OF ACTION-
## UNJUST ENRICHMENT

826. New Mexico Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

827. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled New Mexico Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

828. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

829. At the expense of New Mexico Plaintiffs, FCA received and retained a benefit from New Mexico Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to New Mexico Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to New Mexico Plaintiffs for more than they were worth as a result of FCA's conduct.

830. New Mexico Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of New Mexico Plaintiffs.

831. New Mexico Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

832. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

833. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to New Mexico Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

834. New Mexico Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

835. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

836. New Mexico Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return New Mexico Plaintiffs to the position they occupied prior to dealing with FCA.

837. New Mexico Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## NEW YORK CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MAGNUSON-THE MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

838. New York Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

839. New York Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

840. New York Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). New York Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

841. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC") as adopted by New York at N.Y. U.C.C. Law § 2-101 et. seq.

842. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-101 et. seq.

843. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New York at N.Y. U.C.C. Law § 2-314 et. seq.

844. FCA provided New York Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the

Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

845. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

846. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

847. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, New York Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

848. New York Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with New York Plaintiffs.

849. New York Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. New York Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

850. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including New York Plaintiffs

851. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

852. New York Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. New York Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

## SECOND CAUSE OF ACTION –
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

853. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

854. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC") as adopted by New York at N.Y. U.C.C. Law § 2-101 et. seq.

855. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-101 et. seq.

856. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by New York at N.Y. U.C.C. Law § 2-314 et. seq.

857. FCA provided New York Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

858. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the

restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

859. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

860. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, New York Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

861. New York Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with New York Plaintiffs.

862. New York Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. New York Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

863. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including New York Plaintiffs

864. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

865. New York Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. New York Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

866. New York Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

867. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These

facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

868. Under New York law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

869. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

870. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by New York Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

871. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the New York Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

872. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce New York Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

873. New York Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of New York Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

874. As a result of FCA's omissions and concealments, New York Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

875. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of New York Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

876. New York Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

877. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles

and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

878. New York Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, New York Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

879. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of New York Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION –**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349**

880. New York Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

881. The New York General Business Law ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. FCA's aforementioned conduct violated this statute.

882. New York Plaintiffs are a "person" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

883. FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

884. FCA violated the New York GBL as a result of its manufacture and sale of defective vehicles and its fraudulent omissions regarding the safety, reliability and electric range of the

vehicles, which conduct had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects and by marketing the benefits and capabilities of the Defective Vehicles without disclosing the Defects, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

885. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in its business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including New York Plaintiffs, and imposed a serious safety risk on the public.

886. FCA knew that the Vehicles suffered from inherent defects, were defectively designed or manufactured, and were not suitable for their intended use of providing safe and reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of the Defective Vehicles, FCA failed to disclose and actively concealed the Defects as described above.

887. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

888. Representing through their advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

889. Representing that the Vehicles and their batteries were of a particular standard or quality when they were not;

890. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

891. At the time of the sale to New York Plaintiffs, FCA knew or had reason to know that the Vehicles and their batteries had inherent safety defects as described above, but FCA failed to disclose this material information to New York Plaintiffs

892. Failing to reveal material facts which misled New York Plaintiffs and which facts could not reasonably have been known by New York Plaintiffs;

893. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

894. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law.

895. FCA's violative practices were specifically designed to induce, and did in fact induce, New York Plaintiffs to purchase the Vehicles.

896. New York Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles and their batteries.

897. These violations were not due to a bona fide error. FCA engaged in the same unfair and deceptive acts or practices in connection with the sale or lease of numerous model years of Defective Vehicles.

898. As a direct and proximate result of FCA's unfair or deceptive acts or practices, New York Plaintiffs have suffered and will continue to suffer actual damages, including overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages. Had New York Plaintiffs known of the Defects in the Vehicles, they would not have acquired the Vehicles or would have paid substantially less for them.

899. As a result of the Defects in the Vehicles, New York Plaintiffs were harmed and suffered actual damages including overpayment at the time of acquisition, out of pocket costs, destruction of his home, loss of the Vehicles and various consequential damages

900. Because FCA's willful and knowing conduct caused injury to New York Plaintiffs, they seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

901. FCA's continuing violations of New York law present a continuing risk to the general public and affect the public interest. Plaintiff therefore seeks an order enjoining FCA's continued unfair and deceptive acts and practices as described above.

**SIXTH CAUSE OF ACTION –**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW §350**

902. New York Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

903. FCA is engaged in the "conduct of business, trade or commerce" as defined by a N.Y. GEN. BUS. LAW § 350.

904. The New York General Business Law ("New York GBL") makes unlawful "false advertising in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations made with respect to the commodity." N.Y. GEN. BUS. LAW § 350. FCA's aforementioned conduct violated this statute.

905. FCA violated the New York GBL as a result of its misleading advertising, marketing and statements regarding the Defective Vehicles. FCA's unfair and deceptive acts or

practices occurred repeatedly, systematically and continuously in its business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including New York Plaintiffs, and imposed a serious safety risk on the public.

906. FCA knew that the Defective Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing safe and reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of the Defective Vehicles and their batteries, FCA failed to disclose and actively concealed the Defects as described above.

907. FCA engaged in the following violative acts or practices in the conduct of business, trade or commerce:

908. Representing through their advertising, warranties, and other express representations that the Defective Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

909. Representing that the Defective Vehicles and their batteries were of a particular standard or quality when they were not; and

910. Advertising the Defective Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries.

911. FCA's violative practices were specifically designed to induce, and did in fact induce, New Yrk Plaintiffs to purchase the Vehicles.

912. New York Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicle and its battery.

913. These violations were not due to a bona fide error. FCA engaged in the same unfair and deceptive acts or practices in connection with the sale or lease of numerous model years of Defective Vehicles.

914. As a direct and proximate result of FCA's unfair or deceptive acts or practices, New York Plaintiffs have suffered and will continue to suffer actual damages, including overpayment at the time of purchase, out of pocket costs, loss of use of the vehicles and various consequential damages. Had New York Plaintiffs known that the Vehicles had the Defects, they would not have acquired the Vehicles or would have paid substantially less for them.

915. As a result of the Defects, New York Plaintiffs were harmed and suffered actual damages including overpayment at the time of purchase, out of pocket costs, loss of use of the vehicles and various consequential damages

916. Because FCA's willful and knowing conduct caused injury to New York Plaintiffs, they seek recovery of actual damages in an amount to be proven at trial and statutory damages of $500. Because FCA's conduct was committed willingly and knowingly, New York Plaintiffs are entitled to recover treble damages up to $10,000; punitive damages; reasonable attorneys' fees and costs; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 350.

917. FCA's continuing violations of New York law present a continuing risk to the general public and affect the public interest. New York Plaintiffs therefore seek an order enjoining FCA's continued unfair and deceptive acts and practices as described above.

## SEVENTH CAUSE OF ACTION-
## UNJUST ENRICHMENT

918. New York Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

919. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled New York Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

920. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

921. At the expense of New York Plaintiffs, FCA received and retained a benefit from New York Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to New York Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to New York Plaintiffs for more than they were worth as a result of FCA's conduct.

922. New York Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of New York Plaintiffs.

923. New York Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

924. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

925. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to New York Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

926. New York Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

927. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

928. New York Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return New York Plaintiffs to the position they occupied prior to dealing with FCA.

929. New York Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## UTAH CAUSES OF ACTION

### FIRST CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

930. Utah Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

931. Utah Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Utah Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

932. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Utah at Utah Code Ann. § 70A-2-101 et. seq.

933. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Utah Code Ann. § 70A-2-316.

934. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Utah at Utah Code Ann. § 70A-2-31101 et. seq.

935. FCA provided Utah Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and

catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

936. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

937. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

938. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Utah Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

939. Utah Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Utah Plaintiffs.

940. Utah Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Utah Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

941. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Utah Plaintiffs

942. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

943. Utah Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Utah Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Utah Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

944. Utah Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

945. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Utah at Utah Code Ann. § 70A-2-101 et. seq.

946. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Utah Code Ann. § 70A-2-316.

947. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Utah at Utah Code Ann. § 70A-2-31101 et. seq.

948. FCA provided Utah Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

949. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

950. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

951. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Utah Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

952. Utah Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Utah Plaintiffs.

953. Utah Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Utah Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

954. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints

they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Utah Plaintiffs

955. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

956. Utah Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Utah Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Utah Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION -**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

957. Utah Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

958. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

959. Under Utah law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier

misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

960. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Utah Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

961. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Utah Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

962. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Utah Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

963. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Utah Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

964. Utah Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Utah Plaintiffs were justified and Plaintiffs reasonably relied on FCA's omissions and suffered damages as a result.

965. As a result of FCA's omissions and concealments, Utah Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

966. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Utah Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FOURTH CAUSE OF ACTION - FRAUD BY AFFIRMATIVE MISREPRESENTATION

967. Utah Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

968. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

969. Utah Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Alaska Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

970. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Utah Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE UTAH UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (UTAH CODE ANN. § 3-11 ET SEQ.)**

971. Utah Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

972. The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including but not limited to indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; and "indicat[ing] that a specific price advantage exists, if it does not." UTAH CODE ANN. § 13-11-5. FCA's aforementioned conduct violated this statute.

973. FCA knew, or had reason to know, that consumers would rely on their failure to disclose the defects in its transmission system. FCA therefore engaged in an unconscionable act within the meaning of UTAH CODE ANN. § 13- 11-5.

974. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Utah Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

975. FCA thus violated the CSPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

976. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Utah Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

977. Utah Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

978. FCA had a duty to Utah Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

979. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

980. Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

981. FCA knew that Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

982. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

983. The facts FCA concealed or did not disclose to Utah Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Utah Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

984. FCA's violations present a continuing risk to Utah Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

985. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

986. Utah Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's CSPA violations. Utah Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

987. Pursuant to the Utah CSPA, the Utah Plaintiffs hereby sue Defendant for actual damages. The Utah Plaintiffs further sue Defendant for punitive damages plus attorneys' fees and court costs per Utah Code § 13-11-19 plus any other just and proper relief to the extent available under the Utah CPSA.

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

988. Utah Island Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

989. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Utah Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

990. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

991. At the expense of Utah Plaintiffs, FCA received and retained a benefit from Utah Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Utah Plaintiffs and inequity has resulted. FCA benefitted from selling,

leasing, and distributing the Defective Vehicles to Utah Plaintiffs for more than they were worth as a result of FCA's conduct.

992. Utah Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Utah Plaintiffs.

993. Utah Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

994. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

995. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Utah Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

996. Utah Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

997. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

998. Utah Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Utah Plaintiffs to the position they occupied prior to dealing with FCA.

999. Utah Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## WYOMING CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

1000. Wyoming Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1001. Wyoming Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1002. Wyoming Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Wyoming Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

1003. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wyoming at Wyo. Stat. Ann. § 34.1-2-101 *et. seq.*

1004. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wyo. Stat. Ann. § 34.1-2-101 *et. seq.*

1005. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wyoming at Wyo. Stat. Ann. § 34.1-2-314.

1006. FCA provided Wyoming Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1007. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1008. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1009. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Wyoming Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1010. Wyoming Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Wyoming Plaintiffs.

1011. Wyoming Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Wyoming Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1012. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Wyoming Plaintiffs

1013. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1014. Wyoming Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Wyoming Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Wyoming Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

1015. Wyoming Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1016. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wyoming at Wyo. Stat. Ann. § 34.1-2-101 *et. seq.*

1017. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wyo. Stat. Ann. § 34.1-2-101 *et. seq.*

1018. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wyoming at Wyo. Stat. Ann. § 34.1-2-314.

1019. FCA provided Wyoming Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable

quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1020. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1021. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1022. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

Wyoming Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1023. Wyoming Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Wyoming Plaintiffs.

1024. Wyoming Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Wyoming Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1025. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Wyoming Plaintiffs

1026. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1027. Wyoming Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Wyoming Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Wyoming Plaintiffs seek

an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION-**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

1028. Wyoming Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1029. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1030. Under Wyoming law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

1031. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Wyoming Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

1032. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Wyoming Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

1033. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Wyoming Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

1034. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Wyoming Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1035. Wyoming Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Wyoming Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

1036. As a result of FCA's omissions and concealments, Wyoming Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

1037. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Wyoming Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

1038. Wyoming Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1039. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

1040. Wyoming Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Wyoming Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

1041. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Wyoming Plaintiffs. FCA's' conduct

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT**
**(WYO. STAT. § 40-12-105 ET SEQ.)**

1042. Wyoming Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1043. The Wyoming Plaintiffs and FCA are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

1044. The Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

1045. Each sale or lease of a Vehicle to a Wyoming Plaintiff was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii).

1046. These consumer transactions occurred "in the course of [FCA's] business" under Wyo. Stat. § 40-12-105(a). The Wyoming Plaintiffs purchased or leased one or more Vehicles.

1047. The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits unlawful deceptive trade practices, including when a seller: "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or practices." Wyo. Stat. §§ 40-12-105(a). Defendant intentionally violated the aforementioned provisions of the Wyoming CPA.

1048. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material

facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Wyoming Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

1049. FCA thus violated the Wyoming CPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

1050. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Wyoming Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

1051. Wyoming Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

1052. FCA had a duty to Wyoming Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. Wyoming Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that Wyoming Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

1053. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

1054. The facts FCA concealed or did not disclose to Wyoming Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Wyoming Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

1055. FCA's violations present a continuing risk to Wyoming Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1056. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

1057. Wyoming Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's Wyoming CPA violations. Wyoming Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

1058. Pursuant to Wyo. Stat. § 40-12-108(a), the Wyoming Plaintiffs hereby sue Defendants for actual damages as determined at trial plus punitive damages plus any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

1059. Wyoming Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1060. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Wyoming Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

1061. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

1062. At the expense of Wyoming Plaintiffs, FCA received and retained a benefit from Wyoming Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Wyoming Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Wyoming Plaintiffs for more than they were worth as a result of FCA's conduct.

1063. Wyoming Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time

of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Wyoming Plaintiffs.

1064. Wyoming Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

1065. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

1066. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Wyoming Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

1067. Wyoming Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

1068. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

1069. Wyoming Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Wyoming Plaintiffs to the position they occupied prior to dealing with FCA.

1070. Wyoming Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## LIMITATIONS

## PLAINTIFFS' CLAIMS ARE TIMELY UNDER LAW OR EQUITY

### Class Action Tolling

1071. Plaintiffs gave timely notice of his claims against FCA in the present action as a putative class member in the following class actions (the "Class Actions"):

- *Crowell v. FCA US, LLC*, United States District Court, District of Delaware, Case No. 1:23-cv-00013-MN, which was filed on January 5, 2023;
- *Frisch v. FCA US, LLC*, United States District Court, Eastern District of Michigan, Case No. 2:24-cv-10546-BRM, which was filed on March 4, 2024; and
- *Aiello v. FCA US, LLC*, United States District Court, Eastern District of Michigan, Case No. 2:26-cv-11365-BRM, which was filed on April 24, 2026.

1072. There is no prejudice to FCA in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the Class Action complaints within which Plaintiffs are putative class members and the allegations in the class action lawsuit put FCA on notice of the facts that give rise to Plaintiffs' individual actions, the witnesses necessary for FCA to defend Plaintiffs' individual actions, and the causes of action against FCA asserted in Plaintiffs' individual action.

1073. The Class Plaintiffs alleged the same material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

1074. The facts alleged in the Class Actions are substantially similar, if not identical to the facts alleged herein.

1075. The allegations in the Class Actions are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

1076. The Class Actions protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action. Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

1077. The tolling of Plaintiffs' individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action device, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

1078. The running of all statute of limitations on Plaintiffs' claims asserted against FCA in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the Class Actions.

**The Discovery Rule**

1079. The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

1080. Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs could not have discovered that FCA was concealing and misrepresenting the true properties and capabilities of their Vehicles.

1081. Plaintiff could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect that FCA had intentionally failed to disclose the existence and effect of the Defective Batteries and defective FORMs.

1082. Likewise, a reasonable and diligent investigation could not have disclosed that FCA had information in its possession about the existence of the Defective Batteries and FORM Defect and that they concealed that information.

**Fraudulent Concealment**

1083. Throughout the relevant time period, all applicable statutes of limitation have been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

1084. Well before the date of this Complaint, FCA knew of the existence of the Defective Batteries and FORM Defect, but continued to distribute, sell, and/or lease the Defective Vehicles. In doing so, FCA concealed and expressly denied the existence of the Defective Batteries and FORM Defect and/or failed to notify Plaintiff and others about the true nature of the Defective Vehicles.

1085. Instead of disclosing its deception and the existence of the Defective Batteries and FORM Defect, FCA falsely represented that its vehicles were safe and reliable and fit for their ordinary purpose.

**Estoppel**

1086. FCA had a continuous and on-going duty to tell the truth about the Defective Vehicles and to disclose to consumers including Plaintiff the facts that they knew about the Defective Batteries and FORM Defect.

1087. Although FCA had the duty throughout the relevant period to disclose to Plaintiffs the existence of the Defective Batteries, FORM Defect and Defective Vehicles, FCA chose to intentionally misrepresent and conceal the existence of these defects and the fact that the Defective Vehicles were unfit for their ordinary purpose.

1088. FCA actively concealed the true character, quality, performance, and nature of the Defective Vehicles, Defective Batteries and FORM Defect. Plaintiffs reasonably relied upon FCA's knowing and active concealment of these facts. Thus, FCA is estopped from relying on any statutes of limitations in defense of this action.

**ARBITRATION**

1089. In similar litigation, FCA has alleged that claims such as the instant case are subject to arbitration based on arbitration language in a warranty booklet. Plaintiffs assert that they are not bound by this provision because they never agreed to it and because:

- There was no mutual assent to the arbitration provision;
- FCA never adequately conveyed to Plaintiffs an offer to arbitrate;
- Plaintiffs had no notice of the arbitration provision;
- The arbitration provision was neither disclosed nor discussed during the transactions in which Plaintiffs obtained their vehicles;
- Plaintiffs did not receive the warranty booklet containing the arbitration provision during the transactions in which Plaintiffs obtained their vehicles;
- Plaintiffs did not receive the warranty booklet containing the arbitration provision

when they took possession of their vehicles;

- Plaintiffs never signed an "Agreement to Arbitrate," which was a condition precedent to the formation of any arbitration agreement;
- Plaintiffs never signed an "Arbitration Acknowledgment Form," which was a condition precedent to the formation of any arbitration agreement;
- Plaintiffs timely and validly opted out of the alleged arbitration provision by letter to FCA dated July 7, 2026.

1090. In similar litigation, FCA has alleged that claims such as the instant case are subject to arbitration based on arbitration language in agreements between consumers and the dealers from whom they leased or purchased their vehicles. Plaintiffs assert that FCA, as a non-party to any such agreement, cannot enforce it against Plaintiffs.

## ATTORNEYS' FEES

1091. Plaintiffs seek all reasonable and necessary attorneys' fees in this case, which include the following.

a. preparation and trial of this lawsuit;

b. post-trial, pre-appeal legal services; and

c. an appeal to the Third Circuit Court of Appeals;

## CONDITIONS PRECEDENT

1092. All notices and other conditions precedent to Plaintiffs' rights to recover herein have been performed, have occurred or have been excused.

## JURY DEMAND

1093. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of this matter and tenders the proper jury fee with the filing of this Complaint.

## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully prays that FCA be cited to appear and answer herein, and that upon final trial, they recover their actual damages, consequential damages, additional statutory damages, exemplary damages, attorney's fees, costs of court, pre-judgment and post-judgment interest at the highest legal rates, and such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

/s/ *Antranig Garibian*
Antranig Garibian, Esquire
(Bar No. 4962)
**GARIBIAN LAW OFFICES, P.C.**
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, DE 19803
Tel. (302) 722-6885
Email: ag@garibianlaw.com

Eric D. Pearson
Texas State Bar No. 15690472
eric@hop-law.com
Charles E. Miller
Texas State Bar No. 276523
charles@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 N. State Highway 161, Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**ATTORNEYS FOR PLAINTIFFS**